(C.D. 2333)

Simonds Saw & Steel Company *v.* United States (Lansen-Naeve Corp., a/c Albert Klingelhofer, Party in Interest)

United States Customs Court, Second Division

(Decided April 25, 1962)

*Sharretts, Paley & Carter* (*Joseph F. Donohue* of counsel) for the plaintiff.

*William H. Orrick, Jr.*, Assistant Attorney General (*Richard E. FitzGibbon*, trial attorney), for the defendant.

*James G. McGoldrick* (*Jerome M. Lynes* of counsel) for the party in interest.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Plaintiff has invoked the jurisdiction of this court, pursuant to the provisions of section 516(b) of the Tariff Act of 1930 (19 U.S.C. § 1516(b)), which grants to an American manufacturer the right to challenge the classification by the collector of customs of imported merchandise of a class or kind manufactured by it.

The importation in controversy consists of so-called segmental saws or saw blades, those terms being used interchangeably, which were classified by the collector of customs as "Circular saws, finished or further advanced than tempered and polished," in paragraph 340 of said act (19 U.S.C. § 1001, par. 340), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and duty was imposed thereon at the rate of 10 per centum ad valorem.

Plaintiff, in its protest, claims that the merchandise should properly be classified as "metal tools composed of steel and suitable for use in cutting metal" within the provision of paragraph 352 of said act (19 U.S.C. § 1001, par. 352), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, which provides duty at the rate of 21 per centum ad valorem.

By an amendment of its protest, plaintiff alternatively claims that the articles in issue should be classified as "cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium or more than two-tenths of 1 per centum of tungsten, molybdenum or chromium," in said paragraph 352, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and subjected to duty at the rate of 30 per centum ad valorem.

The text of the statutes involved is here set forth.

Paragraph 340 of the Tariff Act of 1930:

Crosscut saws, mill saws, pit and drag saws, circular saws, steel band saws, finished or further advanced than tempered and polished, hand, back, and all other saws, not specially provided for, 20 per centum ad valorem; jewelers' or piercing saws, 40 cents per gross.

Paragraph 340 of said act, as modified by the Torquay protocol, *supra*:

Circular saws, finished or further advanced than tempered and polished_____ 10% ad val.

Paragraph 352 of the Tariff Act of 1930:

Twist and other drills, reamers, milling cutters, taps, dies, die heads and metal-cutting tools of all descriptions, and cutting edges or parts for use in such tools, composed of steel or substitutes for steel, all the foregoing, if suitable for use in cutting metal, not specially provided for, 50 per centum ad valorem; cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium, 60 per centum ad valorem. The foregoing rates shall apply whether or not the articles are imported separately or as parts of or attached to machines, but shall not apply to holding or operating devices.

Paragraph 352 of said act, as modified by the Sixth protocol, *supra*:

Twist and other drills, reamers, milling cutters, taps, dies, die heads, and metal-cutting tools of all descriptions, and cutting edges or parts for use in such tools, composed of steel or substitutes for steel, all the foregoing, if suitable for use in cutting metal, not specially provided for_____ 21% ad val.

Paragraph 352 of said act, as modified by the General Agreement on Tariffs and Trade, *supra*:

Cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium_____ 30% ad val.

At the trial, two witnesses were called by the plaintiff and four by the party in interest. In addition to the testimony of these witnesses, some 25 exhibits were introduced into evidence.

The material facts of the case are not in dispute.

Plaintiff's exhibits 1 and 2 represent the imported saws, which vary in diameter measurement from approximately 12 inches to 39½ inches.

It was agreed between adversary counsel that the merchandise in controversy is composed of steel and that the segmental sections thereof contain alloying material in excess of the amounts specified in paragraph 352.

A more detailed description of the importation in controversy is given in the testimony of Paul Coggins, a highly qualified and experienced witness for the plaintiff, who described the merchandise as a composite article consisting of a saw body or blade to which a group of segments has been affixed to its periphery and so joined as to make a continuous circle. In exhibit 2, the tooth configuration of the segments, which is peculiar to a metal-cutting tool, to quote the witness, consists—

* * * of an alternately high and alternately low tooth. The high tooth is beveled on both sides at approximately forty-degree angles leaving approximately a one-third land [*sic*] or with the width on the oval tooth. The square tooth is the lower of the two and the cutting action would be that of a lead tooth and a following tooth. The gullet shape lends itself to the curling of a chip, the blade itself has coolant channels which we also have in the blades we manufacture and these coolant channels serve the purpose of carrying a coolant

while the saw is used as a cutting tool into the gullet and later into the edges of the teeth, and act as a lubricant and a cooling medium.

Exhibit 1 differs from exhibit 2 in that the segments are not finished with coolant channels.

The witness stated that, in order to acquire sufficient hardness to cut metal, alloying elements are added to steel to impart hardness, toughness, abrasion resistance, and the ability to hold a cutting edge at an elevated temperature, all of which would not be attained without the use of alloying elements.

The witness further testified that his company also manufactures and sells circular saw blades, designed for use on wood, a sample of which was received in evidence as plaintiff's illustrative exhibit 3.

In comparing the characteristics of exhibits 2 and 3, the witness testified that exhibit 3 does not have segments. It is a flat, round piece of steel which has been set to obtain clearance of the saw body while the material is being cut. The segmental saw has all its clearance in the saw itself and has a thinner body than rim. Another important difference lies in the fact that if a segment becomes damaged, it can be replaced. Moreover, when segments become worn through use, they may be discarded and new segments riveted to the saw blade, whereas through the repeated sharpening of a solid wood saw, its diameter is gradually diminished to a point where it becomes useless.

Other reasons assigned by the witness that exhibit 2 is designed for cutting metal are:

Number one, Exhibit 2 has coolant channels which indicate coolant is to be used with the blade. Coolant is never used on wood. Number two, the gullet shape indicates a rolled chip is desired which is not customarily found in wood. The economics themselves would not lend Exhibit 2 to cutting wood. A comparable blade in the wood saw field would be roughly eighteen dollars whereas a 14-inch segmental saw would cost $139.

With respect to exhibit 3, Coggins stated that he had never seen a set saw cutting ferrous material. It would not have the proper clearance, would dull rapidly, and the lack of proper alloying elements would not permit it to withstand high temperatures.

By reason of the conclusion we have reached herein, it becomes unnecessary to analyze all of the testimony in detail.

The problem as presented to us in the briefs of the adversary parties resolves itself into a clear question of law.

Plaintiff contends, with much show of reason, that Congress intended the provision in paragraph 352 for "cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium," to be a more specific designation of the merchandise in

controversy than the provision for circular saws, or other saws, not specially provided for, in paragraph 340.

It is argued that Congress, in drafting the metals schedule in the Tariff Act of 1930, has shown much solicitude for metal articles containing alloying materials, such as vanadium, tungsten, molybdenum, or chromium, and has subjected them to higher rates of duty.

In paragraph 305 of the act, Congress singled out 16 paragraphs of the metal schedule relating to steel or iron articles and provided an additional duty thereon when containing certain percentages of the alloying materials above mentioned.

This policy was also followed in the structure of paragraph 352 with respect to cutting tools of any kind containing more than specific amounts of alloying materials. This is also true with respect to paragraph 344, relating to cylindrical steel rolls containing certain percentages of alloys, and to the last proviso of paragraph 301, which imposes additional duty on alloying materials contained in various articles provided for therein.

It may be noted here that paragraph 398 of the Tariff Act of 1922 provided only for—

Twist drills, reamers, milling cutters, taps, dies, and *metal-cutting tools of all descriptions*, not specially provided for, containing more than *six-tenths* of 1 per centum of tungsten or molybdenum, * * * [Italics supplied.]

whereas paragraph 352 of the Tariff Act of 1930 specifies *two-tenths* of 1 per centum of tungsten or molybdenum, as well as chromium.

Plaintiff contends that the context of paragraph 352, together with a consideration of statutes *in pari materia*, should be interpreted to remove segmental saws from paragraph 340 and relegate them to paragraph 352, not only because the enumeration in paragraph 352 is a "use" provision, but also by reason of the fact that the subject saws contain alloying materials above the percentages specified in that paragraph.

The party in interest contends, however, that congressional history and proceedings before committees of Congress require a different interpretation of the competing paragraphs, and much testimony was introduced in an effort to support that contention. This contention, however, overlooks the fundamental rule of construction that extrinsic aids should not be relied upon to create an ambiguity where none exists. It is established law that the court should first look to the language of the statute and, if its meaning is clear and free from ambiguity, the intention of Congress should be derived from the language expressed in the act itself.

The party in interest states, in its brief, that an examination of "Tariff Hearings of the Ways and Means Committee of the House of Representatives and of the Senate Finance Committee; the summaries of tariff information for 1921 and 1929; and, preceding tariff

acts, reveals the intent of Congress to provide in paragraph 340, Tariff Act of 1930, for circular saws that cut metal; the tariff history further reveals that circular saws are not within the scope of the terms 'metal-cutting tools' or 'cutting tools' composed of high-speed steel, described in paragraph 352, Tariff Act of 1930."

From these sources of information, the party in interest seeks to place a restricted meaning upon the words "metal-cutting tools of all descriptions" and "cutting tools of any kind," containing more than certain percentages of alloying material, different from the meaning which flows from giving to the words of the statute their ordinary, natural meaning.

It is also argued, based upon some of the testimony, that exhibits 1 and 2 representing the importation are "cut-off tools" (a term not used in the statute) as distinguished from "cutting tools" or "metal-cutting tools."

The party in interest further contends that "the rule of *noscitur a sociis* restricts the words, 'cutting tools of any kind' to the type, class and nature of the tools specifically named in paragraphs 352 and 396."

In other words, the party in interest would have the court interpret the words "metal-cutting tools of all descriptions" and "cutting tools of any kind" as if those terms were prefaced with the word "similar." This would deprive the words "of all descriptions" and "of any kind" of their natural meaning.

The party in interest, in its brief, makes repeated references to *H. Boker & Co. (Inc.)* v. *United States* (1931), 60 Treas. Dec. 482, T.D. 45145—appeal dismissed in *United States* v. *H. Boker & Co.*, 61 Treas. Dec. 970, T.D. 45646. The court there seems to have departed from the basic precept that the meaning of a statute shall be derived from its text and has given tariff history and other external aids first consideration.

The opinion of the court, in the *Boker* case, recites that the merchandise there under consideration was described on the invoice as hack-saw blades and that counsel for the respective parties stipulated that said articles consist of "tools for cutting metal, specifically known as saws." It was further stipulated that such saws had been classified and uniformly assessed with duty "* * * under the various tariff acts as saws, for 20 years prior to the act of 1930." It also appears that said saws contained more than two-tenths of 1 per centum of tungsten. No oral testimony was introduced.

Said saws were classified in paragraph 352 of the Tariff Act of 1930 as "cutting tools of any kind containing more than * * * two-tenths of 1 per centum of tungsten." Plaintiff claimed the saws were more specifically provided for in paragraph 340 as "all other saws, not specially provided for."

The court stated the issue before it as follows:

* * * Are these saws more specifically provided for as "cutting tools * * * containing more than * * * two-tenths of 1 per centum of tungsten," than as "saws, not specially provided for"?

With reference to the classification of hack-saws "for 20 years prior to the act of 1930," the court remarked—

* * * It is fair to assume that Congress knew that such provision had been uniformly held to control over that covering "metal-cutting tools of all descriptions" under the act of 1922. * * *

In this connection, it is significant that, whereas the hack-saws in the *Boker* case were stipulated to contain more than two-tenths of 1 per centum of tungsten, paragraph 398 of the Tariff Act of 1922, so far as pertinent here, provided for metal-cutting tools of all descriptions, containing more than *six-tenths* of 1 per centum of tungsten. Consequently, if the hack-saws imported during the life of the act of 1922 contained less than six-tenths of 1 per centum of tungsten, they would not fall within the scope of the metal-cutting tools provision of said paragraph 398 and the congressional approval relied on in the *Boker* case would have no foundation.

Early in its opinion in the *Boker* case, the court adopted the general rule announced in *Smillie* v. *United States*, 11 Ct. Cust. Appls. 199, T.D. 38966, that—

Where a dutiable provision names an article without terms of limitation all forms of the article are thereby included unless a contrary legislative intent otherwise appears.

The court reasoned that the *eo nomine* provision for saws would embrace the merchandise there under consideration, unless, by paragraph 352, Congress intended to provide more specifically for such saws as contained more than the designated percentage of tungsten.

The court then pointed out that the cutlery schedule abounds with provisions, specifically naming different articles "which may well be considered as cutting tools," naming such articles as "cleavers and knives named in paragraph 355, the knives named in paragraph 356, the clippers, scissors, and shears named in paragraph 357, the pliers named in paragraph 361, the files in paragraph 362, etc."

From this premise, the court expressed the opinion, based upon a review of tariff history, that Congress made evident its intention not to disturb the specific classification for cutting tools provided for by name "such as pliers, shears, knives, razors, and like-named articles."

The court laid emphasis upon the "devastating effect" on the cutlery and other provisions of the metal schedule, if paragraph 352 were so interpreted as to invade the provision for saws in paragraph 340.

It is fair to assume that when Congress deliberately inserted a provision in paragraph 352 for "cutting tools of any kind" containing

alloying materials, it was fully aware of the provisions in surrounding paragraphs enumerating certain articles having a cutting edge, and, furthermore, that said articles were not within the reach of paragraph 352 either because they were not regarded by Congress as "tools," within the meaning of that term, as it is employed in said paragraph, or that those articles were not made with alloying materials above the percentages specified in paragraph 352.

That portion of paragraph 352 which provides for "cutting tools of any kind" containing more than specified amounts of alloying materials made its initial appearance in the Tariff Act of 1930, and it must have been incorporated in paragraph 352 after careful consideration by Congress of its appropriate operation and effect upon other provisions of the metal schedule. Evidence of the care exercised by Congress in drafting paragraph 352 is indicated by the language of paragraph 396 which enumerates drills, bits, gimlets, and various other articles, including "other cutting tools," and states "all the foregoing, if hand tools not provided for in paragraph 352."

Paragraph 352, however, after enumerating certain exemplar articles, specifies "metal-cutting tools of all descriptions * * * all the foregoing, if suitable for use in cutting metal, not specially provided for," and also enumerates "cutting tools of any kind" containing certain percentages of alloying materials.

As stated, *supra*, plaintiff contends that paragraphs 352 and 340 should be interpreted in accordance with the fundamental principle that the intent and meaning ascribed to those paragraphs by Congress should be derived from the context in which the language to be interpreted is used, and by an examination of the statutes *in pari materia*; that only after this method is exhausted should resort be had to extrinsic aids.

This point was ably and elaborately treated by our appellate court in *United States* v. *Kung Chen Fur Corporation*, 38 C.C.P.A. (Customs) 107, 117, C.A.D. 447. The following pertinent excerpts are quoted from that opinion:

It is well settled, of course, that where ambiguity exists in the phraseology of a statute it is proper to resort to various rules, including an examination of legislative history, as an aid in construing it in order to arrive at the legislative intent. This principle is so thoroughly established that no citation of authority is deemed necessary in its support.

It is equally as well settled that extrinsic aid properly may be invoked only after ambiguity has been found to exist; or, to state it differently, it is not proper to invoke extrinsic aid and thereby create ambiguity. In the case of *Railroad Commission of Wisconsin, et al.* v. *Chicago, Burlington & Quincy Railroad Co.*, 257 U.S. 563, 588-9, the Supreme Court of the United States declared that extraneous aids "are only admissible to solve doubt and not to create it." * * *

Further, the court stated—

We indulge the further observation that matter relating to legislative history, which matter itself requires construction in order to understand it, is of no great aid to a court in construing a statute to which such matter purports to relate.

Furthermore, not everything which may bear some relation to the formation and enactment of a statute is pertinent to the legislative history of that statute. *Congress has not delegated to unofficial individuals or organizations, which may appear before one of its committees advocating legislation, the authority to construe for it and the public statutes which it enacts.* Courts have the authority to do that. [Italics supplied.]

It is the opinion of the court in the instant case that paragraph 352 bears on its face the key to its proper interpretation.

The first portion of the paragraph provides for drills, reamers, milling cutters, taps, dies, die heads, and metal-cutting tools of all descriptions, not specially provided for. Obviously, those articles are such as are made of ordinary carbon steel or contain less than the specified percentages of alloying material. This is clearly indicated by the second portion of paragraph 352 which takes care of "cutting tools of any kind" containing above a certain percentage of specified alloying elements.

Consequently, the only cutting *tools* in the metal schedule, if any, which would be invaded by the second portion of paragraph 352 would be such cutting tools as are made with the use of alloying material above the percentages stated in paragraph 352. And that is precisely what the congressional policy was intended to accomplish.

A construction of paragraph 352, in harmony with the views above expressed, is logical and reasonable. Moreover, it derives solely from an examination of the context of the statutes involved.

The provision in paragraph 352 for cutting tools of all kinds is a "use" provision limited by specific quantities of alloying elements. It is, therefore, a more specific provision for the subject saws than the provision in paragraph 340 for circular saws, finished or further advanced than tempered and polished. *Carter & Son* v. *United States*, 6 Ct. Cust. Appls. 253, T.D. 35475; *United States* v. *Snow's United States Sample Express Co.*, 8 Ct. Cust. Appls. 351, T.D. 37611; and *Magone* v. *Heller*, 150 U.S. 70. Those cases established the rule of construction giving controlling force and effect to a "use" provision.

More recently our appellate court, in *General Chain & Belt Company* v. *United States*, 46 C.C.P.A. (Customs) 66, C.A.D. 698, has restated that doctrine. In that case, so-called "mortise chains," which were designed for use in cutting blind holes in wood or similar materials, were held to be properly classifiable in paragraph 352, as modified by the General Agreement on Tariffs and Trade, as cutting tools of any kind containing more than the specified amounts of alloying

elements, rather than as chain and chains of all kinds, made of iron or steel, within the diameter measurements in paragraph 329.

In the course of its opinion, the court observed:

\* \* \* It is difficult to compare the scope of those provisions as to the number of different articles which they respectively include. Obviously there are many cutting tools which are not chains, and there are many chains of any specified range of dimensions which are not cutting tools.

Paragraph 329 is more specific in that it gives particular ranges of size, but paragraph 352 appears to be more specific as to the material of which the articles are made, since it calls for specified amounts of vanadium, tungsten, molybdenum or chromium and in effect is thus limited to particular alloys of iron or steel, whereas paragraph 329 recites iron or steel broadly. \* \* \*

Further, the court stated—

\* \* \* It appears therefore that the competing provisions are fairly well balanced as to scope, and under such circumstances paragraph 352, which is a use provision, must prevail over the structural provision of paragraph 329, *Drakenfeld & Co.* v. *United States*, 9 Ct. Cust. Appls. 124, T.D. 37979; *United States* v. *A. W. Faber, Inc.*, 16 Ct. Cust. Appls. 467, T.D. 43211; *United States* v. *Lansen-Naeve Corp.*, 44 CCPA 31, C.A.D. 632, and cases there cited.

The application of the cases above cited to the facts of the case at bar leads clearly to the conclusion that the provision for cutting tools of any kind containing specified alloys—a use provision—is more specific than the provision for circular saws, finished or further advanced than tempered and polished, or for other saws, not specially provided for.

Instead of following that doctrine in the *Boker* case, the court chose to adopt the rule in the *Smillie* case, *supra*, in which a use provision was not involved.

If we were to adopt the reasoning of the *Boker* case and apply it here, it would be necessary for us to disregard the time-honored rule of interpretation that, where a use provision is in competition with an *eo nomine* or descriptive provision, the former ordinarily prevails, and this we are not inclined to do. Therefore, we do not follow the *Boker* decision.

Upon the record before us and for the reasons stated, we sustain the claim of plaintiff that the saws in controversy should be classified as cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium, in paragraph 352, as modified, *supra*, and dutiable at the rate of 30 per centum ad valorem.

Judgment will issue accordingly.