(C.D. 2386)

J. E. BERNARD & Co., INC. *v.* UNITED STATES

■■■■■

United States Customs Court, Second Division

■■■■■

(Decided March 13, 1963)

*Wallace & Schwartz* (*Barnes, Richardson & Colburn* by *Earl R. Lidstrom* and *Joseph Schwartz* of counsel) for the plaintiff.
*John W. Douglas*, Acting Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation described on the consular invoice as "Metal cutting bandsaw blades" was classified by the collector of customs as "Mfr. articles of steel, nspf," in paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and duty was imposed thereon at the rate of 19 per centum ad valorem.

Plaintiff claims that the merchandise should be classified as steel bandsaws, finished or further advanced than tempered and polished, in paragraph 340 of said act (19 U.S.C. § 1001, par. 340), as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462, and dutiable at the rate of 10 per centum ad valorem.

The pertinent text of the statutes involved is here set forth.

Paragraph 397 of the Tariff Act of 1930, as modified by the sixth protocol, *supra:*

Articles or wares not specially provided for, whether partly or wholly manufactured:

   *   *   *   *   *   *   *

 Composed wholly or in chief value of * * * steel, * * * but not plated with platinum, gold, or silver, or colored with gold lacquer:

   *   *   *   *   *   *   *

  Carriages, drays, * * *

   *   *   *   *   *   *   *

  Other, composed wholly or in chief value of iron, steel, * * *_____ 19% ad val.

Paragraph 340 of said act, as modified by the Annecy protocol, *supra:*

Mill saws, pit and drag saws, and steel band saws, finished or further advanced than tempered and polished_____ 10% ad val.

The following exhibits were introduced at the hearing of the case:

Plaintiff's exhibit 1—representative sample of the imported merchandise.

Plaintiff's exhibit 2—representative sample of an American-made product, similar to exhibit 1.

Plaintiff's exhibits 3 and 4—leaflets illustrating certain foreign-made bandsaw blades.

At the trial, three witnesses were called to testify, all of whom appeared on behalf of the plaintiff.

Edward Jurasko, manager and sales promoter for Hakansson Industries, Inc., for whose account the present importation was made, testified to his familiarity with the merchandise dealt in by his company and stated he had visited the factory of the Hakansson Industries in Sweden where he had witnessed the entire manufacturing process of merchandise, such as exhibit 1.

It appears that strip steel in long lengths is put through a milling process in which teeth are cut into the metal strips. The teeth are then electronically heat treated, which is a tempering process designed to harden the metal into which the teeth are cut to a degree which will enable the finished article to perform its function as a metal cutting device.

The witness stated that after the saw teeth are cut into the metal, they are polished and set by what the witness described as a "waving set." The importance of the "waving set" is to have teeth cut to meet the requirements of use, it appearing that the number of teeth may vary from 2 to the inch to as many as 32 teeth to the inch, depending upon the ultimate use of the saw.

This is followed by an oil bath to protect the metal. The strips are then coiled into lengths of 100 and 500 feet and packaged for shipment.

After importation, and prior to being placed on a bandsaw machine, the merchandise must be cut to the desired size of a given machine—of which there are approximately 100 different sizes—and, after being cut, the two ends are joined together by butt welding. The welded joint is then ground and retempered, and the blade is then ready to be fitted onto the bandsaw machine.

Jurasko stated that, in his commercial transactions, he had received orders and sold the subject merchandise as bandsaw blades and that, to prepare the merchandise for its ultimate use, the blade is cut and welded to the length desired for the particular machine for which it is adapted. The witness described a bandsaw machine as a machine of various horsepower, with two wheels around which a blade is drawn, as depicted in plaintiff's exhibit 4. This is the only use to which the subject merchandise is applied.

The evidence given by Jurasko would indicate that the merchandise in controversy is known interchangeably as "band saw" or "band saw blade" and, obviously, in order that it may function for its intended purpose, the article must be put on a bandsaw machine.

Plaintiff's second witness, Edwin R. Samsey, owner of the firm of E. R. Samsey & Co., of Toledo, Ohio, described himself as an importer and exporter, representing five European manufacturers for the sale of their goods in the United States, and testified he had been engaged in international trade for 40 years. He had represented a manufacturer of bandsaw blades some 14 years. Through this witness, plaintiff's exhibit 2, representing a coil of bandsaw blades, manufactured by the American Saw & Manufacturing Co. of Springfield, Mass., was received in evidence. Samsey stated that the merchandise represented by plaintiff's exhibit 1 and plaintiff's exhibit 2 had the same uses and could be used on the same machines; that plaintiff's exhibits 3 and 4 depicted articles which he dealt in as bandsaw blades. The witness further stated that there are approximately 60 to 65 American-made machines, also a great many foreign-made machines in this country, which are known as bandsaws, and that since these machines do not take a standard size blade "* * * the only way that you can carry band saws, in order to service all these multitudes of different makes, and different models * * *" is in coils.

Samsey had observed the manufacture of bandsaw blades in the United States and in England and testified that the manufacturing process in both countries is practically the same, differing only in detail. After examining plaintiff's exhibit 1, he was clearly of the opinion that it was both tempered and polished.

Plaintiff's third witness, William Lundmark, treasurer for W. Q. Lundmark, Inc., testified that he was a distributor of machine tools and, since 1942, had administered the business of his company prior to his "semi-retirement," but still continued "distributing and merchandising band saw blades and machines." He was familiar with plaintiff's exhibit 1, which is an article he bought and sold under the name of bandsaws; that there are approximately several hundred machines which use merchandise such as exhibit 1; that since said machines differ in size, they require a different footage or length of the saw which it will use and accommodate, each model requiring a different length of from 5 feet to 22 feet, there being various intermediate lengths.

Lundmark had seen blades such as exhibit 1 manufactured and agreed that the general process of manufacture was as described by the witness Jurasko. After examining exhibit 1, he was clearly of the opinion that it had been both tempered and polished, and that, in his business of selling merchandise, it was designated as a bandsaw.

On cross-examination, the witness reiterated that exhibit 1 was a bandsaw and that it was usable in its imported condition (unwelded) since there are machines that will hold 100 feet of the article such as exhibit 1; that the longest length for welded bandsaws was 25 feet; that the bandsaws in coils of lengths of 100 or 150 feet are sometimes referred to as coils of stock but the subject merchandise is, nevertheless, known as bandsaws. After the bandsaw is cut to the length required by a particular model, it is attached to a machine, the function of which is to revolve two wheels capable of developing a speed of from 50 feet a minute to 15,000 feet a minute, depending upon the type of material to be cut.

In support of the collector's classification, the Government, in its brief, takes the position that the merchandise, as imported in coils, is nothing more or less than material which after importation is further processed to become a bandsaw. The case of *United States* v. *The Harding Co.*, 21 CCPA 307, T.D. 46830, is cited by the Government as being factually analogous to the instant case. The merchandise there consisted of so-called brake linings, imported in bales in running lengths of 100 feet or more, of various widths and thicknesses. It was sold in such lengths to automobile service stations and repair shops and was used, after being cut to proper lengths, with holes drilled in it to fit the holes on the shoes for brakes, as brake linings for automobiles.

The commodity above described was classified by the collector of customs as manufactures of asbestos yarn in paragraph 1501(a) of the Tariff Act of 1930, whereas the importer contended that it should be classified as parts of automobiles in paragraph 369.

In its decision in the *Harding* case, the court applied the controlling principle set up in the following authorities: *United States* v. *Buss & Co.*, 5 Ct. Cust. Appls. 110, T.D. 34138; *Snow's United States Sample Express Co.* v. *United States*, 8 Ct. Cust. Appls. 17, T.D. 37161; *Rogers* v. *United States*, 14 Ct. Cust. Appls. 51, T.D. 41552.

Those cases recognized the fact that many articles are not produced as individual or separate products but, for economy of manufacture, are first produced in the piece or in running lengths.

As stated in the *Buss* case—

\* \* \* The rule of decision is therefore established that where such articles are imported in the piece and nothing remains to be done except to cut them apart they shall be treated for dutiable purposes as if already cut apart and assessed according to their individual character or identity. This follows, however, *only in case the character or identity of the individual articles is fixed with certainty and in case the woven piece in its entirety is not commercially capable of any other use.* [Italics supplied.]

In the *Harding* case, the court found that although the merchandise was used "when cut into proper lengths and the necessary holes

drilled therein, as brake linings for automobiles," it was " 'commercially capable' of various other uses," and "the identity of the individual articles is not fixed with certainty." The claim for classification as parts of automobiles, finished or unfinished, was rejected.

In the case before us, the evidence establishes that, to produce the subject merchandise, long strips of steel are put through a milling process in which the teeth are formed and electronically heat treated. After the teeth are cut into the metal, they are set, tempered, and polished. The product is then subjected to an oil bath, coiled to the desired lengths, and packaged for shipment from the factory. In that condition, the merchandise arrived in this country. At that time, the character and identity of the article as a steel bandsaw, further advanced than tempered and polished, was, in our opinion, "fixed with certainty." The commodity was not "commercially capable of any other use" than as a bandsaw, needing only cutting to the required length for a given machine and having the ends butt welded.

It seems obvious, from a natural reading of paragraph 340, as modified, *supra*, that Congress was providing for steel bandsaws in two stages of production: (1) Steel bandsaws, "finished" and (2) steel bandsaws "further advanced than tempered and polished" but not "finished." Had Congress intended to provide for steel bandsaws in a "finished" condition only, it was quite unnecessary to add the words, "or further advanced than tempered and polished," which we regard as words of extension and definition. All words of the statute must be accorded an appropriate meaning whenever possible.

The conclusion we have reached herein is clearly supported by a review of the tariff history of statutes, *in pari materia*, relating to certain steel strips, bandsaws, and other saws. This is well set forth in the brief of plaintiff, from which we quote the following:

Our research has revealed that the phrase "finished or further advanced than tempered and polished" first appeared in the saw provision of the Tariff Act of 1897. All of the Tariff Acts since 1894 have had a provision for saws of some kind or another, but prior to the Tariff Act of 1897, band saws were given no particular attention. Paragraph 154 of the Tariff Act of 1894 (28 Stat. 519) provided:

"Cross-cut saws . . . .; mill saws . . . .; pit and drag saws . . . .; circular saws . . . .; hand, back and all other saws, not specially provided for in this Act."

When the Tariff Act of 1897 was enacted it contained two provisions relating to band saws. They were: Paragraph 128 (30 Stat. 160),

". . . . steel bands or strips, untempered, suitable for making bandsaws, 3¢ per lb. and 20%; if tempered, or tempered and polished, 6¢ per lb. and 20% ad valorem."

and Paragraph 168 (30 Stat. 165),

"Cross-cut saws . . . .; mill saws . . . .; steel band saws, finished or further advanced than tempered and polished, 10¢ per lb. and 20% ad val.; pit and drag saws . . . .; circular saws . . . .; hand, back and all other saws, not specially provided for in this Act."

When the Tariff Act of 1909 was enacted, the provision for steel strips suitable for making band saws previously found in Paragraph 128 of the Act of 1897 was dropped, and the provision for steel band saws, finished or further advanced, was continued as Paragraph 168 of the Act of 1909 (36 Stat. 29). In lieu of the former Paragraph 128, Paragraph 124 of the Act of 1909 (36 Stat. 22) provided:

". . . . bands and strips of steel, exceeding 12 feet in length, not specially provided for in this section."*

---

*This provision was held to include the merchandise which had been formerly classified under Paragraph 128, Tariff Act of 1897, *Joshua Oldham & Son, et al.* vs. *United States,* 19 TD 1024, TD 30989, GA 7108.

[* * *] "The tariff act of 1897 provided (paragraph 128) a rate of 3 cents per pound plus 20 per cent ad valorem on 'steel bands or strips, untempered, suitable for making band saws,' and 'if tempered, or tempered and polished,' a rate of 6 cents per pound plus 20 per cent ad valorem. During the life of the old act the merchandise we have before us was classified under the above-noted provisions. It is noted that these provisions have disappeared from the act of 1909, but in lieu thereof we find a new provision reading:

'Bands and strips of steel, exceeding 12 feet in length, not specially provided for.'

"No question arose under the old act of classifying this commodity under that act as 'sheets and plates' of steel (paragraph 135). The question as now framed is whether the provision for 'bands and strips of steel, exceeding 12 feet in length' is any the less applicable to the merchandise than the old one, which was qualified by the phrase 'suitable for making band saws.' In our opinion, the new provision merely extends its scope so as to cover goods not within the terms of the old one, and does not exclude such as were." [* * *]

The foregoing review of earlier statutes clearly indicates the purpose to increase the rates of duty on steel bands or strips with proper relation to the advances in stages of manufacture from the raw material to the finished bandsaw.

It is interesting to note that, many years ago, this court, then known as the Board of General Appraisers, decided a case upon the subject of saws, which has some bearing on the instant case, *Jas. F. McCoy & Co.* v. *United States,* 1 Treas. Dec. 428, T.D. 20758 (1899).

It appears from the opinion, in that case, that the merchandise consisted of certain saws in coils, in pieces from 10 to 20 feet in length, and from one-half of an inch to five-eighths of an inch in width, with teeth set from 10 to 12 to the inch. After importation, the merchandise was cut and made into butcher handsaws, 16 to 20 inches in length. The merchandise was classified in paragraph 168 of the Tariff Act of 1897 within the provision for "steel band saws, finished or further advanced than tempered and polished."

The court observed that "* * * band saws are well-known commercial articles to be fitted on band-saw machines in lengths from about 17 to 54 inches and in width from one-quarter of an inch up to

12 inches. Band saws for cutting wood have teeth comparatively wide apart, running from one tooth to seven teeth to the inch." It appears, further, from the opinion of the court that the saws were returned for duty as bandsaws, not that they were, in fact, bandsaws, but because "they more nearly resembled such saws than any of the other saws specially named in the paragraph."

Being of the opinion that the saws could not be classified as band-saws, by similitude, the court sustained the claim that they were dutiable in said paragraph 168 as "other saws not specially provided for."

The issue in *Redden & Martin* v. *United States*, 5 Ct. Cust. Appls. 485, T.D. 35147, bears some resemblance to the issue in the present case. The court there held that certain merchandise described as "unpunched, unfinished scissors, sometimes called scissors forgings, intended to be ground down, punched, and manufactured into finished scissors" were properly classifiable within the provision for "scissors and shears, and blades for the same, finished or unfinished," in paragraph 152 of the Tariff Act of 1909.

It appears from the opinion of the court that the articles there in controversy were made from tool steel by the process of stamping and forging; they were uniform in size and dimension and crudely represented unfinished scissors blades. They were not punched with necessary pivot holes, nor were they tempered, sharpened, nickel plated, colored, or polished. To finish the articles into scissors blades required some 56 processes in which the articles passed through the hands of many different workmen, which greatly increased the cost of their manufacture. By the processes above referred to, the articles were tempered, straightened, punched, nickel plated, colored, ground, polished, and fitted to one another. But, said the court—

* * * These processes, however, do not add any material to the metal frames as they now exist, nor do they take any material therefrom, for the sole purpose of altering their present scissorslike form.

Further, the court stated—

The decisive factor in the present case is found in the circumstance that the articles in question were brought to their present condition as part of the process of manufacturing them into finished scissors blades, and that this process has so far advanced in their case that the articles possess the elementary form and substance of scissors blades and are unsuitable commercially for any other use. * * * The numerous and important processes of manufacture through which they must yet pass are essentially finishing processes, such as do not forbid their present classification as unfinished scissors blades.

In the instant case, the subject merchandise has been so far advanced in manufacture that the welding which fits it for use on machines that power it, may well be regarded as a final finishing proc-

ess. Moreover, the welding process does not add any material to the article, nor does it take any material therefrom. In any event, prior to importation, the merchandise has been brought to a condition where its only practical commercial use or purpose is as bandsaws, the use for which they were designed. The merchandise was, in fact, further advanced than tempered and polished.

The *Redden* decision was cited and followed in *Nyman & Schultz* v. *United States*, 14 Ct. Cust. Appls. 432, T.D. 42060. In its opinion, in the *Nyman* case, the court described the merchandise as thin strips of steel, in rolls weighing 10 or 12 pounds, highly polished and with perforations consisting of a straight row of holes "running the entire length of the strip and in the middle thereof. The holes are in sets of three, separated by a space of approximately three-fourths of an inch, the two spaces between the three holes being about one-fourth of an inch wide. The center hole of the three is round, while the two end holes are oblong, having round ends with flat sides."

It seems that, after importation, the strips of steel above referred to were placed in a machine which broke them into pieces, approximately the size of a finished razor blade. The articles were then ground and finished to the exact shape of Gillette razor blades, without, however, cutting edges. Processes of honing and stropping resulted in a finished razor blade.

The court concluded, from an examination of a sample in the case, and a fair consideration of the testimony, that the imported commodity possessed the shape, size, and other characteristics of unfinished blades for safety razors, and was, therefore, properly classified by the collector as "unfinished blades for safety razors" in paragraph 358 of the Tariff Act of 1922.

It should be noted, in passing, that throughout the testimonial record the witnesses used the terms "band saws" and "band saw blades" interchangeably, which is in harmony with the common understanding. This is borne out by the following definitions of the noun, "saw."

The American College Dictionary (1961), page 1080:

saw, *n.* 1. a tool or device for cutting, typically a thin blade of metal with a series of sharp teeth.

Webster's New World Dictionary (1960), page 1297:

saw, *n.* 1. *a)* a cutting tool, of various shapes and sizes, consisting essentially of a thin blade of metal, usually steel, the edge of which is a series of sharp teeth, and which may be worked by hand or machinery. * * *

Each of the foregoing definitions has illustrations of saws, those which are intended to be operated by hand set in frames or with handles, while the illustration of a circular saw is obviously designed to be adjusted to a power machine—as in the case of a bandsaw—in order that it may perform its intended function. Note *Simonds Saw*

& *Steel Company* v. *United States* (*Lansen-Naeve Corp.*, a/c *Albert Klingelhofer*, *Party in Interest*), 48 Cust. Ct. 186, C.D. 2333, now on appeal.

A description of the types of saws enumerated in paragraph 340 is contained in the "Dictionary of Tariff Information," published by the United States Tariff Commission, September 1924, page 635.

The evidence in this case, which is not refuted, establishes that the merchandise, before importation, has been subjected to a milling process which cuts teeth into metal strips; the teeth are then tempered by an electronic process in order to harden the teeth to a greater degree than the remaining portion of the saw; the teeth are then polished and set by what has been described as a "waving set," whereby the number of teeth may vary from 2 to 30 to the inch, depending upon the ultimate use of the saw. The merchandise is then subjected to an oil bath to protect the metal and coiled into lengths of 100 and 500 feet and packaged for shipment. From the foregoing, it is clear that the merchandise in issue consists of steel bandsaws, further advanced than tempered and polished, in paragraph 340 of the Tariff Act of 1930, as modified, *supra*. All that remains to be done in this country to prepare the merchandise for its ultimate use is to cut and weld the bandsaw to the length desired for the particular machine with which it is to be used.

Based upon the record, the authorities cited, and for the reasons stated, we find and hold that the subject merchandise is properly classifiable in said paragraph 340, as modified, as "steel band saws, finished or further advanced than tempered and polished" and dutiable at 10 per centum ad valorem, as claimed by plaintiff.

The protest is sustained to the extent indicated, and judgment will issue directing the collector of customs to reliquidate the entry accordingly.