UNITED STATES, (LANSEN-NAEVE CORP. A/C ALBERT KLINGELHOFER, PARTY-IN-INTEREST) *v.* SIMON SAW & STEEL COMPANY (No. 5126)*

---

*C.A.D. 834.

34

United States Court of Customs and Patent Appeals, January 23, 1964

*James G. McGoldrick* (*Jerome M. Lynes*, of counsel) for Party-in-Interest. *Chapman & Friedman, Bruce E. Clubb*, amicus curiae.

*Sharretts, Paley & Carter* (*David O. Elliott and Joseph F. Donohue,* of counsel) for appellee.

[Oral argument November 6, 1963, by Mr. McGoldrick, Mr. Donohue, and Mr. Clubb, amicus curiae]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Jr., Associate Judges

SMITH, Judge, delivered the opinion of the court:

This appeal is from a decision and judgment of the United States Customs Court, Second Division, wherein the court sustained the protest of the present appellee. (48 Cust. Ct. 186, C.D. 2333.) ■■ The protest is that of an American manufacturer made pursuant to section 516 (b) of the Tariff Act of 1930. The Collector of Customs had classified the merchandise at bar, segmental circular saws, under paragraph 340 of the Tariff Act of 1930, as modified, which includes circular saws, "finished or further advanced than tempered and polished."

The court below held that the articles involved were more specifically provided for under paragraph 352 of the same act as "cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium," and directed classification accordingly.

The competing paragraphs are:

*Paragraph 340:*

Crosscut saws, mill saws, pit and drag saws, circular saws, steel band saws, finished or further advanced than tempered and polished, hand, back, and all other saws, not specially provided for, 20 per centum ad valorem; jewelers' or piercing saws, 40 cents per gross.

*Paragraph 340* (as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, 163, T.D. 52739, effective on June 6, 1951) :

Circular saws, finished or further advanced than tempered and polished _____ 10% ad valorem.

*Paragraph 352:*

Twist and other drills, reamers, milling cutters, taps, dies, die heads and metal-cutting tools of all descriptions, and cutting edges or parts for use in such tools, composed of steel or substitutes for steel, all the foregoing, if suitable for use in cutting metal, not specially provided for, 50 per centum ad valorem; cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium, 60 per centum ad valorem. The foregoing rates shall apply whether or not the articles are imported separately or as parts of or attached to machines, but shall not apply to holding or operating devices.

*Paragraph 352* (as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, effective January 1, 1948) :

Cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium_____ 30% ad val.

*Paragraph 352* (as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, 164, T.D. 52739, effective on June 6, 1951) :

Twist and other drills, reamers, milling cutters, taps, dies, die heads, and metal-cutting tools of all descriptions, and cutting edges or parts for use in such tools, composed of steel or substitutes for steel, all the foregoing, if suitable for use in cutting metal, not specially provided for_____ 25% ad val.

*Paragraph 352* (as modified by Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, effective on June 30, 1956) :

Twist and other drills, reamers, milling cutters, taps, dies, die heads, and metal-cutting tools of all descriptions, and cutting edges or parts for use in such tools, composed of steel or substitutes for steel, all the foregoing, if suitable for use in cutting metal, not specially provided for_____21% ad val.

The issue presented by the present appeal is whether the imported "circular saws, finished, or further advanced than tempered and polished" were properly classified by the Collector of Customs at the Port of New York under the *eo nomine* description for such articles in paragraph 340, Tariff Act of 1930, as modified, or whether such imported articles should be classified instead as "cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium" under the second provision in paragraph 352 of said act, as modified, in accordance with the decision of the Customs Court.

The American manufacturer's protest can be sustained only if it is established 1) that the imported circular saws do not come within the *eo nomine* provisions of paragraph 340 and 2) that they come within paragraph 352. Since the collector classified the imported circular saws under paragraph 340, the American manufacturer if he is to prevail must first overcome the prima facie correctness of the collector's classification. In attempting to meet this burden, appellee argues in its brief as follows:

Paragraph 340 calls for saws, listing several by name, and further providing for all other saws, not specially provided for. Webster's New International Dictionary defines the different named saws as follows :

crosscut saw. A saw used for crosscutting.

crosscut, *adj.* 1. Made or used for crosscutting. 2. Cut across or transversely; esp., cut across the grain, as wood; also, having transverse or oblique cuts.

mill saw–sash saw.

sash saw. A strip of steel, toothed on one edge, that is stretched in a sash or frame,—used for sawing in small water-power mills.

pit saw *n.* A saw worked by two men, one (the top sawyer) standing on the log and one (the pit sawyer) beneath it, often in a pit. See sawyer, 1.—

sawyer *n.* 1. One whose occupation is to saw logs or timber, as in lumbering or in a saw mill; * * *

band saw. A saw in the form of an endless steel belt, running over pulleys; also, a power sawing machine using this device. Band saws are used chiefly for sawing wood. The pulleys are arranged usually one above the other, but sometimes horizontally. A band resaw is a band saw with a narrow worktable on which thick planks are cut into thinner boards.

handsaw *n.* A saw used with one hand. * * *

backsaw *n.* A saw, as a tenon saw, with a blade stiffened by an added metallic back.

tenon *n.* A projecting member left by cutting away the wood around it for insertion into a mortise to make a joint, esp. one passing entirely through the piece in which the mortise is cut.

circular saw. A thin steel disk with teeth on its periphery, used by revolving it upon a spindle.

It will be noticed that wood, in the form of planks, logs or timber, is the only material mentioned upon which these saws commonly operate. The Summary of Tariff Information, 1929, Vol. 1, pp. 730–31 describes in more detail the woodcutting activities of the mentioned saws in paragraph 340. It specifically notes that the circular saws are commonly used in saw mills and for sawing wood for fuel.

The rule *noscitur a sociis* supports the construction that the term "circular saws" in paragraph 340 is limited to saws designed for work on wood. The only saw therein designed for use on metal is the jeweler's saw, and it is set apart, separately named, and carries its own unique rate of duty.

Appellee's entire argument is predicated upon limiting paragraph 340 to saws for cutting wood, thereby excluding its own saws, which are designed to cut metal. This rather tenuous argument is said to be supported by the rule *noscitur a sociis.*

The rule *noscitur a sociis* is not ordinarily invoked unless there is a doubt as to the meaning or purpose of a word. The doubt generally arises not from the word per se, but rather its context in the paragraph or its relationship to other language in the law, and the rule must yield if the meaning of the word can be otherwise ascertained. *United States* v. *Urdika Wire Die Works,* 19 CCPA 182, T.D. 45292.

We are not persuaded by appellee's argument that there is doubt as to the meaning of paragraph 340, as modified. The imported articles were within the common meaning of the term circular saws when that provision was enacted, and continue to be within the common meaning thereof. The meaning of terms used in the tariff act is ascertained by recourse to court decisions, dictionaries and other written authorities. See, e.g., *Nix* v. *Hedden,* 149 U.S. 304 (1893) ; *United States* v. *Flory & Co.,* 15 CCPA 156, T.D. 42219.

Paragraph 340, as modified, specifically provides for "circular saws finished or further advanced than tempered or polished." The common meaning of a "circular saw" is expressed in the 1931 and 1955 editions of Webster's New International Dictionary of the English Language as "a thin steel disc with teeth (usually forward set) on its periphery used by revolving it on a spindle." "Circular saws" are similarly defined in the 1961 edition of Webster's New International and in the 1931 and 1957 editions of Funk & Wagnalls New Standard Dictionary of the English Language. It is clear that the criteria for a circular saw are these : a steel disc, teeth on the periphery and use by revolving it on a spindle. The imported articles possess these characteristics.

These criteria do not include any qualification relating to the type of material the saw is designed to cut. However, the common meaning of a "saw" contemplates that it may be designed or used for sawing materials such as wood, iron, metal, bone, etc. In 1899, Webster's International Dictionary of the English Language defined the term as, "an instrument for cutting or dividing substances, as wood, *iron*, etc., consisting of a thin blade, or plate, of steel, with a series of sharp teeth on the edge, which remove successive portions of the material by cutting and tearing." (Emphasis added.) In the 1926, 1931 and 1955 editions of the same dictionary, the definition is substantially the same. Further, in making reference to the materials a saw may cut and tear, the definitions mention "wood, *metal*, bone, etc." (Emphasis added.)

The record establishes, and it never has been disputed, that the imported articles are designed to be used, and are ordinarily used, to saw metal work pieces. The common meaning of saws and circular saws contemplates their use to cut a variety of materials, such as "wood, metal, bone, etc." ■ It is elementary that a party who asserts that a tariff term has a meaning in the trade and commerce of the United States which is different from its common meaning has the burden of proving such different meaning. *United States* v. *Wilfred Schade & Co.*, 16 Ct. Cust. Appls. 366, T.D. 43092. The record does not establish that "circular saws" is a term which in the trade and commerce of the United States contemplates only saws used for sawing wood.

Appellee further seeks to distinguish the imported articles by their particular type of construction. They are of the so-called "segmental" type, wherein the continuous series of teeth on the periphery is made up of separate segments or groups of teeth, the segments being so joined, and the several saw-teeth which are part of each segment being so arranged, as to make a continuous circle of teeth on the periphery. Each segment is made detachable and replaceable. ■ Although this "segmental" type circular saw was not being produced or imported when the Tariff Act of 1930 was enacted, such fact would not exclude

such a new style of the article from classification under paragraph 340 as a circular saw, where this new style article resembles the circular saws in commerce prior to 1930 in those particulars which the tariff paragraph establishes as the criteria of the classification. *Klipstein & Co.* v. *United States*, 4 Ct. Cust. Appls. 510, 514, T.D. 33936.

The Customs Court seems to have concluded that the subject saws were covered by both paragraph 340 as "circular saws," and by paragraph 352 as "cutting tools of any kind," but that they were properly classifiable under paragraph 352 because of the "time-honored rule of interpretation that, where a use provision is in competition with an *eo nomine* or descriptive provision, the former ordinarily prevails." As stated by the court (48 Cust. Ct. at 194–95) :

> The provision in paragraph 352 for cutting tools of all kinds is a "use" provision limited by specific quantities of alloying elements. It is, therefore, a more specific provision for the subject saws than the provision in paragraph 340 for circular saws, finished or further advanced than tempered and polished. *Carter & Son* v. *United States*, 6 Ct. Cust. Appls. 253, T.D. 35475; *United States* v. *Snow's United States Sample Express Co.*, 8 Ct. Cust. Appls. 351, T.D. 37611; and *Magone* v. *Heller*, 150 U.S. 70. Those cases established the rule of construction giving controlling force and effect to a "use" provision.

> \* \* \* \* \* \* \*

> The application of the cases above cited to the facts of the case at bar leads clearly to the conclusion that the provision for cutting tools of any kind containing specified alloys—a use provision—is more specific than the provision for circular saws, finished or further advanced than tempered and polished, or for other saws, not specially provided for.

> \* \* \* \* \* \* \*

> If we were to adopt the reasoning of the *Boker* case [60 Treas. Dec. 482, T.D. 45145, *appeal dismissed*, 61 Treas. Dec. 970, T.D. 45646] and apply it here, it would be necessary for us to disregard the time-honored rule of interpretation that, where a use provision is in competition with an *eo nomine* or descriptive provision, the former ordinarily prevails, and this we are not inclined to do. Therefore, we do not follow the *Boker* decision.

It would seem, therefore, that the only reason the lower court assigned for placing circular saws in the paragraph 352 "cutting tools of any kind" category rather than the paragraph 340 "circular saws" category was that the former is a use provision and the latter is an *eo nomine* provision.

On the record before us, however, we can find no reason for resort to the principle of construction upon which the opinion below is predicated. ▮ In *United States* v. *Electrolux Corporation*, 46 CCPA 143, 147, C.A.D. 718, this court confined application of the rule to those cases where the competing provisions are otherwise in balance. In that case we said :

> The next and major argument of appellant is that classification in paragraph 339 is compelled by the fact that it is a "use" provision which *must* pre-

vail over paragraph 353, which is said to be an *eo nomine* or a descriptive designation. This result is supposed to be required by a firmly established "doctrine" that, under the circumstances, the use designation prevails. * * *

\* \* \* \* \* \* \*

While it is true that this court and its predecessor on many occasions have held that a use provision *should* prevail over some other, and have used the word "doctrine" in referring to the "doctrine of use," an examination of a sufficient number of cases will show that this so-called doctrine is subject to "exceptions" whenever it comes into conflict either with a clearly expressed legislative intent or a competing provision which is obviously more specific than the "use" provision, as applied to the merchandise at bar. *Actually the "doctrine" appears to be a convenient rule of thumb for resolving issues where the competing provisions are otherwise in balance.* * * * (Emphasis added in last sentence.)

■ It is well established that the basic rule of construction applicable to any case involving the construction of a statute is that the intent of the Congress is to be given effect. Thus, for example, this court has said in *United States* v. *Clay Adams Co., Inc.*, 20 CCPA 285, 288, T.D. 46078:

* * * All rules of construction must yield if the legislative intent is shown to be counter to the apparent intent indicated by such rules. *The master rule in the construction of statutes is to so interpret them as to carry out the legislative intent.* * * * (Emphasis added.)

See also, e.g., *M. Pressner & Co.* v. *United States*, 42 CCPA 48, C.A.D. 568; *United States* v. *E. De Grandmont, Inc.*, 21 CCPA 17, T.D. 46345.

■ Over the years the courts have developed a number of methods for determining the intent of Congress. The first and most obvious of these is to examine the statute itself. See *Magone* v. *Heller*, 150 U.S. 70 (1893). ■ In customs classification cases, if one of the competing provisions can be said to be more specific and definite with respect to the merchandise at bar, then the merchandise may properly be classified on this basis alone. See *United States* v. *Electrolux Corporation*, supra. ■ The rule of relative specificity is a judicial aid to the construction of a statute in order to conform with the intent of Congress. In the *Electrolux* case, supra, this court held that the more specific provision is the one having requirements which are more difficult to satisfy. And in *Fink* v. *United States*, 170 U.S. 584, 586–87 (1898), the Supreme Court effectively stated the logical basis for the rule of relative specificity when it said:

* * * Being reached, then, in some of its aspects by some of the provisions found in both paragraphs, the question is, which, if either of the two, is so dominant in its control of the article in question as to exclude the operation thereon of the other. The rule is that this, if possible, is to be determined by ascertaining whether one of the two paragraphs is more definite in its application to the article in question than is the other. * * *

In other words, the paragraph that provides for the article with the greatest degree of accuracy and certainty is the more specific provision.

In the instant case, the lower court found paragraph 352, which provides for "cutting tools," to be more specific than paragraph 340, which provides for "circular saws." It did so while finding that the imported articles were, in fact, circular saws. When the two provisions are compared, we think it clear that paragraph 340 is narrower in scope and is more limited in its application to different articles.

Paragraph 340 provides for circular saws as such. To meet the requirements of this term, the article must be circular in shape and have a continuous series of teeth on its periphery, and be capable of performing a sawing function. On the other hand, paragraph 352 provides for cutting tools of any description or any kind, and in fact lists six different kinds of cutting tools in its first provision. Numerous additional kinds of cutting tools are named in the companion provision, paragraph 396. The common (dictionary) meaning of the named cutting tools includes a great many different types.

In paragraph 340 only one article is capable of qualifying as a circular saw: it must be an article circular in shape, with teeth on the periphery. In the second provision of paragraph 352, selected by the lower court as the applicable clause, it would be possible to include many different articles, since the definitive criterion is the ability to cut. Even though all circular saws may be cutting tools, it is clear that all cutting tools are not circular saws. For example, although all drills, reamers, and taps are cutting tools, certainly none are circular saws.

Sawing is a specific form of cutting and a saw is a specific tool designed to carry out that form of cutting operation. This being the case, we think the *eo nomine* provisions of paragraph 340 are clear and unambiguous. Such a specific designation should prevail over the more general and far less specific designation of the class of cutting tools in paragraph 352. We believe this conclusion is inescapable from an examination of the statutes involved in this case. Metal cutting circular segmental saws were intended to be classified under paragraph 340, and not under paragraph 352. The competing categories are essentially 1) "circular saws" in a particular stage of production, 2) "metal-cutting tools of all descriptions," not specially provided for, and 3) "cutting tools of any kind" containing certain amounts of specified alloys. The merchandise at bar, it may be assumed, fits all three categories, being a circular saw, a metal-cutting tool, and a cutting tool of any kind. Presumably, the phrase "not

specially provided for" prevents the application of the second category, since the merchandise is specially provided for in both of the others. Thus the competing provisions, as noted by the lower court, are in reality two: "circular saws" and "cutting tools of any kind," and the test is "Which of these is more definite and controlling with respect to circular saws?" In other words, is the term "circular saw" a better description of metal-cutting circular segmental saws, than "cutting tool of any kind?" It is difficult to imagine how Congress, in the necessarily brief but precise language of legislation, could better have described circular saws such as those involved here, than with the term "circular saw."

For the foregoing reasons, the decision of the Customs Court is *reversed.*

WORLEY, C.J., concurs in the result.