**ORDERED** that Customs shall reliquidate Frito–Lay's taco shells under HTSUS 1905.90.10.

**BAXTER HEALTHCARE CORPORATION OF PUERTO RICO, Plaintiff,**

v.

**UNITED STATES, Defendant.**

Slip Op. 98–16.
Court No. 95–05–00637.

United States Court of International Trade.

Feb. 24, 1998.

Katten Muchin & Zavis (Mark S. Zolno, Michael E. Roll), New York City, for Plaintiff.

Frank W. Hunger, Asst. U.S. Atty. General of U.S.; Joseph I. Liebman, Attorney–in–Charge, International Trade Office, Commercial Litigation Branch, Civil Division, U.S. Dept. of Justice (Barbara Silver Williams), Sheryl A. French, Office of Asst. Chief Counsel, U.S. Customs Service, for Defendant.

## OPINION

CARMAN, Chief Judge.

This case is before this Court on cross-motions for summary judgment pursuant to U.S. CIT R. 56. Plaintiff, Baxter Healthcare Corporation of Puerto Rico ("Baxter"), challenges the United States Customs Service's ("Customs") classification of the merchandise at issue under subheading 5404.10.8080 of the Harmonized Tariff Schedule of the United States ("HTSUS")[1], at a duty rate of 7.8% *ad valorem* as a "synthetic monofilament of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm". Plaintiff argues the merchandise at issue is neither synthetic nor a monofilament, but is classified properly in subheading 9019.20.0000, HTSUS, as part of an "artificial respiration apparatus" because it is a part of plaintiff's UNIVOX blood oxygenator. Alternatively, plaintiff argues blood oxygenators and their parts are classified properly in subheading 9018.90.7080, HTSUS, as part of an "electro-medical apparatus". Plaintiff requests this Court order Customs to reliquidate plaintiff's entries under subheading 9019.20.0000, HTSUS, dutiable at 4.2% *ad valorem*, or alternatively under subheading 9018.90.7080, HTSUS, dutiable at 3.8% *ad valorem*, and refund all excess duties with interest as provided by law. Plaintiff also moves for oral argument on its Motion for Summary Judgment and defendant's Cross–Motion for Summary Judgment, contending oral argument on the issues raised in the pending motions will aid the Court in reaching its decision.

Defendant cross moves for summary judgment, requesting this Court deny plaintiff's motion and dismiss this action. Defendant argues the merchandise at issue falls within the definition of a synthetic monofilament set forth in the HTSUS, the Explanatory Notes and all lexicographic sources. Alternatively, defendant argues even if the merchandise at issue were classifiable as a part of an oxygenator, it is not classifiable as an artificial respiration apparatus, nor as part of an electro-medical apparatus, but rather as an "electro-surgical apparatus" under subheading 9018.90.60, HTSUS, dutiable at a rate of 7.9% *ad valorem*.

This Court has jurisdiction under 28 U.S.C. § 1581(a) (1988) and this action is before the Court for *de novo* review under 28 U.S.C. § 2640(a)(1) (1988). For the reasons which follow, this Court denies plaintiff's Motion for Summary Judgment and grants defendant's Cross–Motion for Summary Judgment. The Court denies plaintiff's Motion for Oral Argument.

## BACKGROUND

A. *Subject Merchandise*

Plaintiff, the importer of the merchandise at issue in this case, described the merchandise on its commercial invoices as the "Oxyphan (R) Capillary Membrane for Oxygenation." (Pl.'s Stmt of Mater. Facts at 1.) The trademarked name of the merchandise sold to plaintiff is OXYPHAN. Plaintiff imports the merchandise at issue from Germany and purchases the OXYPHAN capillary membrane from Akzo Nobel Faser AG.

The merchandise at issue is produced using a thermally induced phase separation process. During this process, a polymer (polypropylene) is melted and mixed with two natural seed oils (soy and castor oil), and the mixture is extruded through a spinneret. During the cooling phase, the oils are separated and removed from the polymer, creating pores in the membrane. Once the cooling phase is complete, the membrane is dried and wound on spools. Baxter purchased the merchandise on spools that contained approximately ten kilometers of finished mem-

---

1. The HTSUS provisions cited by the Court appear in HTSUS (2nd ed.1990).

brane. The merchandise at issue was always sold to Baxter by the length of the capillary membrane contained on a spool (in kilometers) and never by decitex.[2] The membrane was not subject to a drawing process[3] during manufacture. Baxter used the merchandise at issue solely in the production of its UNIVOX oxygenators, which are utilized almost exclusively to oxygenate blood in connection with surgical procedures.

The merchandise at issue was liquidated by Customs under subheading 5404.10.8080, HTSUS, at a duty rate of 7.8% *ad valorem* as "synthetic monofilament of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm".

Plaintiff protested Customs' classification of the merchandise within the time provided by law. Customs subsequently denied plaintiff's protest on December 3, 1991, in Headquarters Ruling ("HQ") 950047. In HQ 950047, Customs concluded "[a]ll the specifications of the subject merchandise meet the prerequisites of Heading 5404, HTSUS[ ], and classification is therefore proper within this provision of the Nomenclature." HQ 950047 (December 3, 1991). After having paid all liquidated duties, plaintiff timely commenced this action.

### B. Statutory Provisions at Issue

The parties rely on the following provisions of the HTSUS:

(1) Plaintiff's Proposed Subheading

9019    Mechano-therapy appliances; massage apparatus; psychological aptitude-testing apparatus; ozone therapy, oxygen therapy, aerosol therapy, *artificial 5respiration or other therapeutic respiration apparatus;* parts and accessories thereof:

. . . .

9019.20.000    Ozone therapy, oxygen therapy, aerosol therapy, artificial respiration or other therapeutic respiration apparatus; parts and accessories thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3.7%

(emphasis added).

(2) Plaintiff's Alternative Subheading

9018    Instruments and appliances used in medical, surgical, dental or veterinary sciences, including scintigraphic apparatus, *other electro-medical apparatus* and sight-testing instruments; parts and accessories thereof:

. . . .

9018.90    Other instruments and appliances and parts and accessories thereof:

. . . .

9018.90.70    Other:

---

**2** **The coarseness of a yarn or filament is usually gauged as "denier".** The denier was the unit used in the real-silk industry long before manmade fibers were invented. Another unit which is sometimes used instead of the denier is the tex, which is defined as the weight in grams of 1,000 meters. Another way to look at it is that the tex of a yarn or filament is its weight in milligrams per meter. Sometimes the term decitex or dtex is encountered; its relation to the others is:
0.1 tex = 1 d(cci)tex = 100 millitex = 0.9 denier.

The tex is a universal unit, used for all fibers. *See* R.W. Moncrieff, *Man–Made Fibres* 5, 7–8 (5th ed.1970).

**3** **Drawing is defined as "[t]he forming of a sheet of thermoplastic material in which the material is stretched and its thickness reduced."** Jeffrey R. Stewart, assisted by Frances E. Spicer, *An Encyclopedia of the Chemical Process Industries* 241 (1956).

. . . .

9018.90.7080      Electro-medical instruments and appliances and parts and accessories thereof:

. . . .

Other

. . . .

Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.2%

(emphasis added).

(3) Subheading Used by Customs in Classifying and Liquidating the Merchandise at Issue

5404      *Synthetic monofilament* of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm; strip and the like (for example, artificial straw) of synthetic textile materials of an apparent width not exceeding 5 mm:

5404.10      Monofilament:

. . . .

Other:

. . . .

Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7.8%

(emphasis added).

(4) Defendant's Proposed Alternative Subheading

9018.90.60    Electro-surgical instruments and appliances, other than extracorporeal shock wave lithotripters; all the foregoing and parts and accessories thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7.9%

### CONTENTIONS OF THE PARTIES

Plaintiff argues Customs erred in classifying the merchandise at issue as a synthetic monofilament in subheading 5404.10.8080, HTSUS, "because the OXYPHAN® capillary membrane does not meet the definition of a 'synthetic monofilament.' It is neither synthetic, nor is it a 'monofilament.'" (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 7–8.) Plaintiff argues the merchandise is a part of a blood oxygenator which is classified properly as an "artificial respiration apparatus" in subheading 9019.20.0000, HTSUS, or alternatively, as an "eletromedical apparatus" in subheading 9018.90.7080, HTSUS. Based on these arguments, plaintiff requests this Court order Customs to reliquidate the entries of the merchandise at issue under subheading 9019.20.0000, HTSUS, dutiable at 4.2% *ad valorem*, with interest as provided for by law, or alternatively under subheading 9018.90.7080, HTSUS, dutiable at 3.8% *ad valorem*, with interest as provided for by law.

Defendant argues the merchandise at issue fits the definition of a synthetic monofilament set forth in the HTSUS, the Explanatory Notes and all lexicographic sources and thus was properly classified under subheading 5404.10.8080, HTSUS, as a "synthetic monofilament of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm". Defendant maintains that according to the HTSUS, Explanatory Notes, and lexicographic authorities, the merchandise at issue

is not part of another article but "is simply a material." (Def.'s Mem. in Supp. of Def.'s Cross–Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Br.") at 5.) Defendant further argues even if the merchandise at issue were classifiable as part of an oxygenator, it is not classifiable under subheading 9019, HTSUS, as an artificial respiration apparatus because "[t]he imported monofilament does not perform the same functions as articles *ejusdem generis* with artificial respiration apparatus." (*Id.*) Defendant additionally contends because the imported monofilament meets the description for electro-surgical apparatus, "it would not be classified[, as plaintiff contends,] in the basket provision for electro-medical apparatus, heading 9018.90.70", but would rather "be classifiable as an electro-surgical apparatus, under subheading 9018.90.60, HTSUS." (*Id.*)

## STANDARD OF REVIEW

In a case involving factual disputes between the parties, the government's classification decision is presumed to be correct, *see* 28 U.S.C. § 2639(a)(1) (1988), and the party challenging the decision has the burden of overcoming the statutory presumption by a preponderance of the evidence. *See St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 769 (Fed.Cir.1993). Where, as here, there are no material facts in dispute and only questions of law remain, the statutory presumption of correctness under § 2639 is irrelevant, and the Court has a statutory duty to decide the meaning of a classification term. *See* 28 U.S.C. § 2640(a)(1) (1988). No deference attaches to Customs' classification decisions where there are no disputed issues of material fact.

In *Rollerblade, Inc. v. United States*, 112 F.3d 481 (Fed.Cir.1997), the Court of Appeals for the Federal Circuit ("Federal Circuit") held the Court of International Trade's ("CIT") duty "to reach the correct decision" in classification cases would be subverted if Customs' interpretation of a classification term was given deference. *Rollerblade, Inc.*, 112 F.3d at 484; *see also Universal Electronics v. United States*, 112 F.3d 488, 491–93 (Fed.Cir.1997). As a result, if the Court finds, because of evidence or other authority presented by plaintiff, that Customs' classification decision is incorrect, this Court must reach the correct classification on its own or after remand to the agency. *See e.g., Jarvis Clark Co. v. United States*, 2 Fed. Cir. (T) 70, 74–75, 733 F.2d 873, 878 ("[T]he court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand"), *petition for reh'g denied*, 2 Fed. Cir. (T) 97, 739 F.2d 628 (1984).

## DISCUSSION

### A. *Summary Judgment*

This case is before the Court on cross-motions for summary judgment pursuant to U.S. CIT R. 56. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." U.S. CIT R. 56(d). "The Court will deny summary judgment if the parties present 'a dispute about a fact such that a reasonable trier of fact could return a verdict against the movant.'" *Ugg Int'l., Inc. v. United States*, 17 CIT 79, 83, 813 F.Supp. 848, 852 (1993) (citation omitted). Both parties in this case agree, and the Court finds, there are no genuine issues of material fact which would prevent this Court from deciding this action on the basis of the pending motions for summary judgment. (*See* Pl.'s Br. at 7; Def.'s Br. at 6.) Therefore, the sole issue remaining before the Court is under which tariff heading the merchandise at issue properly is classified.

### B. *Whether the Merchandise at Issue is a Synthetic Monofilament*

#### (1). Whether Oxyphan is Synthetic

Baxter's primary argument is that the merchandise at issue was classified incorrectly as a "synthetic monofilament" because it is not synthetic and because it is not a monofilament. Defendant argues Baxter is incorrect on both grounds.

In addressing the definition of a synthetic fiber, plaintiff argues a synthetic fiber is one that is produced by the polymerization of organic monomers. Plaintiff maintains

> [t]he OXYPHAN® capillary membrane cannot be classified as a "synthetic" monofilament in HTSUS subheading 5404 because it does not meet the definition of synthetic. When an article is "more than" the article described by [a] (sic) tariff provision, it cannot be classified in that provision. In this case, the OXYPHAN® capillary membrane is manufactured by mixing a polymer with soy and castor oils. The manufacturing process consists of "more than" [the] (sic) polymerization [of] (sic) organic monomers. Accordingly, the imported OXYPHAN® capillary membrane is not "synthetic."

(Pl.'s Br. at 9 (citations omitted).)

Defendant, however, argues the above-quoted definitions mean "synthetic 'man-made' fibers are filaments of organic polymers produced by polymerization of organic monomers" and "as the General Explanatory Notes to Chapter 54, specifically list, polypropylene is a synthetic fiber." (Def.'s Br. at 10.) Defendant also contends "[b]ecause the subject material in its imported condition, is made entirely of polypropylene, a synthetic man-made monofilament, it is properly classified as a synthetic monofilament." (Id. at 10–11 (footnote omitted).) Defendant notes the rule that an article is classified according to its condition upon importation bolsters this argument. (See id at 10 n. 2 (citing Mitsubishi Int'l Corp. v. United States, 78 Cust. Ct. 4, C.D. 4686 (1978)).)

Defendant further supports its argument by pointing out Baxter, in its response to question number 23 of Defendant's First Interrogatories and Request for Production of Documents, agreed the imported merchandise is synthetic by admitting that "the polypropylene used to manufacture Oxyphan is synthetic." (Id. at 11 (quoting Pl.'s Resp. to Def.'s 1st Interrog., in Def.'s App. Ex. 3 at 20).) In further responding to plaintiff's argument, defendant states "Baxter's contention is most obviously unmeritorious as the statute does not ever limit its definition of synthetic filaments to filaments produced

only by polymerization of organic monomers, without any other incidental process or materials, which are subsequently removed." (Id. at 11.) Defendant additionally points out the General Explanatory Notes, in listing examples of synthetic fibers, describe polyurethane as resulting from the polymerization of polyfunctional isocyanates with polyhydroxl compounds, such as castor oil, and thus contemplated the inclusion of oils in the production of synthetic fibers. Finally, defendant points to General Rule of Interpretation ("GRI") 2(b) which provides:

> Any reference in a heading to a material or substance shall be taken to include a reference to mixtures or combinations of that material or substance with other materials or substances. Any reference to goods of a given material or substance shall be taken to include a reference to goods consisting wholly or partly of such material or substance....

HTSUS, Gen. R. Interp. 2(b). Defendant concludes in accordance with GRI 2(b) and the General Explanatory Notes to Chapter 54, "synthetic filaments made with oil fall within the HTSUS definition of synthetic, and such fibers would be classified in Chapter 54." (Def.'s Br. at 12.)

Classification of merchandise under the HTSUS is performed in accordance with the General Rules of Interpretation, taken in order. GRI 1 states "classification shall be determined according to the terms of the headings and any relative section or chapter notes." HTSUS, Gen. R. Interp. 1. In the absence of a precise definition appearing in the HTSUS, the correct meaning of a term is usually resolved by ascertaining its common and commercial meaning. In construing such terms, "the court may rely upon its own understanding, dictionaries and other reliable sources." Medline Indus., Inc. v. United States, 62 F.3d 1407, 1409 (Fed.Cir.1995) (citing Marubeni Am. Corp. v. United States, 35 F.3d 530 (Fed.Cir.1994)).

The HTSUS definition for synthetic, as it applies to monofilaments in Chapter 54, HTSUS, is set forth in Note 1 of that Chapter and provides:

> 1. Throughout the tariff schedule, the term "man-made fibers" means staple

fibers and filaments of organic polymers produced by manufacturing processes, either:

(a) By polymerization of organic monomers, such as polyamides, polyesters, polyurethanes or polyvinyl derivatives; or

(b) By chemical transformation of natural organic polymers (for example, cellulose, casein, proteins or algae), such as viscose rayon, cellulose acetate, cupro or alginates.

The terms *"synthetic"* and *"artificial"*, used in relation to fibers mean: synthetic: fibers as defined at (a); artificial: fibers as defined at (b).

The terms *"man-made"*, *"synthetic"* and *"artificial"* shall have the same meanings when used in relation to *"textile materials"*.

HTSUS, Chapter 54, Note 1.

■ Additionally, the Harmonized Commodity Description and Coding System General Explanatory Notes[4] for Chapter 54, state with respect to synthetic fibers:

The basic materials for the manufacture of these fibres are generally derived from coal or oil distillation products or from natural gas. The substances produced by polymerisation are either melted or dissolved in a suitable solvent and then extruded through spinnerets (jets) into air or into a suitable coagulating bath where they solidify on cooling or evaporation of the solvent, or they may be precipitated from their solution in the form of filaments.

At this stage their properties are normally inadequate for direct use in subsequent textile processes, and they must then undergo a drawing process which orientates the molecules in the direction of the filament, thus considerably improving

certain technical characteristics (e.g., strength).

The main *synthetic fibers* are:

. . . .

(3) *Polypropylene:* Fibres composed of acyclic saturated hydrocarbon linear macromolecules having in the macromolecular composition at least 85% by weight of units with every other carbon atom carrying a methyl side group in an isotactic position and without further substitution.

. . . .

(7) *Polyurethane:* Fibres resulting from the polymerisation of polyfunctional isocynates with polyhydroxy compounds, such as castor oil, butane –1, 4–diol, polyether polyols, polyester polyols.

Harmonized Commodity Description and Coding System, Chapter 54, General Explanatory Note I (1986).

■ This Court finds Customs' decision the merchandise at issue is synthetic is correct. Plaintiff's argument that because the merchandise is manufactured by mixing a polymer with soy and castor oils, the manufacturing process consists of "more than" the polymerization of organic monomers does not demonstrate an error in Customs' classification of the merchandise as synthetic. Moreover, this Court finds defendant's argument the definition of synthetic fibers is not limited to filaments produced only by the polymerization of organic monomers, without any other incidental process or materials which are subsequently removed, is supported by the HTSUS as well as by the General Explanatory Notes which, in listing examples of synthetic fibers, describe polyurethane as resulting from the polymerization of polyfunctional isocyanates with polyhydroxl com-

**4.** The *Explanatory Notes* constitute the World Customs Organization's official interpretation of the HTSUS. While not legally binding on the parties, the Notes provide a commentary on the scope of each heading and interpretive rule of the HTSUS and are useful in ascertaining the classification of merchandise under the HTSUS. *See Lonza, Inc. v. United States,* 46 F.3d 1098, 1109 (Fed.Cir.1995) ("While the *Explanatory Notes* do not constitute controlling legislative his-

tory, they do offer guidance in interpreting HTS[US] subheadings."); *see also Rollerblade, Inc.,* 112 F.3d at 486 n. 3 (although the Explanatory Notes are not controlling legislative history, "they are nonetheless intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting its subheadings"). The Customs Service itself asserted that the Explanatory Notes "should be consulted for guidance." HQ 954822 (December 22, 1994).

pounds, such as castor oil, in the production of synthetic fibers.

Additionally, this Court notes the deposition testimony of Gregory P. Watson, an agent of the plaintiff:

THE WITNESS: ... As the material comes out of Akzo's spinneret, it is a combination of three terms: a polypropylene, which is a synthetic material, and two natural occurring oils. The natural occurring oils are later extracted from this material.

Q. Right. So when it is imported into the United States, it is purely made of a synthetic material?

A. It is purely made out of polypropylene.

Q. And that is a synthetic material?

A. Yes.

(Def.'s Br. Ex. 1 at 66–67.) The Court also notes plaintiff, in answer to Defendant's First Interrogatories and Request for Production of Documents, stated "[t]he polypropylene used to manufacture Oxyphan is synthetic." (Def.'s Br. Ex. 3 at 20.) As a result of the above, this Court finds Customs properly classified the merchandise at issue as synthetic. The Court next turns to plaintiff's argument the merchandise at issue is not a monofilament.

**(2). Whether Oxyphan is a Monofilament**

■■■ The HTSUS does not define the term "monofilament", and as stated above, in the absence of precise definitions in the HTSUS, the correct meaning of a term is usually resolved by ascertaining its common and commercial meaning. *See, e.g., Nestle Refrigerated Food Co. v. United States,* 18 CIT 661, 663 (1994) ("When a tariff term is not clearly defined in either the HTSUS or its legislative history, the correct meaning of a tariff term is generally resolved by ascertaining its common and commercial meaning."). In construing such terms, "the court may rely upon its own understanding, dictionaries and other reliable sources." *Medline Industries, Inc.,* 62 F.3d at 1409.

The General Explanatory Notes to heading 5404 help provide a definition of the term monofilament by stating:

5404.10—*Monofilament*

5404.90—*Other*

This heading covers:

. . . .

(1) *Synthetic monofilament.* These are filaments extruded as single filaments. They are classified here *only* if they measure 67 decitex or more and do not exceed 1 mm in any cross-sectional dimension. Monofilaments of this heading may be of any cross-sectional configuration and may be obtained not only by extrusion but by lamination or fusion.

. . . .

All these products are generally in long lengths, but remain classified here even if cut into short lengths and whether or not put up for retail sale. They are used according to their different characteristics in the manufacture of brushes, sports rackets, fishing lines, surgical sutures, upholstery fabrics, belts, millinery, braids, etc.

This heading *does not include:*

(a) Sterile synthetic monofilament (*heading 30.06*).

(b) Synthetic monofilament of which any cross-sectional dimension exceeds 1 mm, or strip and flattened tubes (including strip and flattened tubes folded along the length), whether or not compressed or twisted (for example, artificial straw), *provided* that the apparent width (i.e., in the folded, flattened, compressed or twisted state) exceeds 5 mm (*Chapter 39*).

(c) Synthetic monofilament measuring less than 67 decitrex of *heading 54.02.*

(d) Strip and the like of *Chapter 56.*

(e) Synthetic monofilament, with hooks attached or otherwise made up into fishing lines (*heading 95.07*).

(f) Prepared knots and tufts for brushmaking (*heading 96.03*).

Harmonized Commodity Description and Coding System, Explanatory Notes to Heading 54.04 (1986).

Plaintiff argues the merchandise at issue is not a monofilament for five reasons. First, plaintiff contends strength is an essential

property of a monofilament and the merchandise at issue "does not have the tensile strength associated with monofilaments." (Pl.'s Br. at 9.) Plaintiff explains synthetic fibers and filaments are manufactured to obtain "strength higher than that of the materials from which they are made" and "the OXYPHAN® capillary membrane simply lacks the strength associated with a monofilament." (*Id.* at 9–10.)

Second, plaintiff argues the merchandise at issue is not a monofilament "because it does not undergo an essential process common to the production of monofilaments: drawing", where molecules are oriented through a mechanical stretching process in order to strengthen the filaments. (*Id.* at 10.) Plaintiff quotes the General Explanatory Notes' provision that synthetic fibers " 'must undergo a drawing process which orients the molecules in the direction of the filament, thus considerably improving certain technical characteristics (*e.g.*, strength).' " (*Id.* at 10 (quoting General Explanatory Notes, Chapter 54).) Plaintiff concludes, "[n]ot only does the [merchandise at issue] not undergo a drawing or stretching process, [but] any stretching of the membrane would destroy its porosity and render it unsuitable for its intended use." (*Id.* at 11.)

Third, plaintiff maintains the merchandise at issue cannot be defined as a monofilament because it is 45% porous and "[n]o monofilament is intentionally porous because porosity would weaken a monofilament." (*Id.*)

Fourth, plaintiff argues "the language of HTSUS heading 5404 bears no relevance to the capillary membrane. HTSUS heading 5404 covers monofilaments of 67 *decitex* or more. However, the term 'decitex' is not used in the sale of [the merchandise at issue]", but rather is a term used for measuring textile materials. (*Id.*) Plaintiffs further

notes the merchandise at issue "is a medical, not a textile, product and is sold by length, not decitex." (*Id.*)

Finally, plaintiff argues "the high cost of the capillary membrane also distinguishes it from a textile product. Baxter pays at least 15 times more for [the merchandise at issue] than it pays for monofilaments that are also used in production of the UNIVOX®." (*Id.* at 12.) Plaintiff also relies upon the opinion of its expert, Dr. Lawrence Broutman, a research professor of materials engineering and the president of a private consulting company, who stated in his affidavit that "the OXYPHAN® capillary membrane is not a monofilament. Rather, it is a porous membrane made in the form of a capillary to facilitate its end use for high gas permeability." (Annex to Pl.'s Mot. for Summ. J. ("Pl.'s Annex") Ex. 1 at 4.)

In response to plaintiff's five reasons the merchandise at issue cannot be a monofilament, defendant responds "not only do [plaintiff's] declarations contradict Baxter's own explicit admissions made in deposition by the agent of the plaintiff, they contradict every lexicographic authority, and the declarants themselves failed to provide any lexicographic or other support for their positions." (Def.'s Br. at 13–14.) Defendant concludes "none of Baxter's proposed restrictions on the term monofilament exist in either the HTSUS, or the common meaning of the term monofilament." (*Id.* at 25.)

Defendant argues the General Explanatory Notes for HTSUS heading 5404 indicate that synthetic monofilaments are extruded as single filaments and may be of any cross-sectional configuration.[5] Defendant further contends the General Explanatory Notes to Section XI, the section in which heading 5404 falls, also offer guidance and state:

> flat, oval, round, or of any other cross-sectional configuration, which are not over 0.06 inch in maximum cross-sectional dimension.

(Def.'s Br. at 15 n. 4 (quoting TSUS, Schedule 3, Part 1(E), Note 3(b) (1985)).) Defendant argues "the TSUS defined monofilament as single filaments which were solid, hollow, flat, oval or any other cross-sectional configuration. The drafters of the HTSUS, therefore contemplated hollow and solid filaments as monofilaments when preparing the HTSUS." (*Id.*)

---

**5.** Defendant continues to explain in a footnote that under the predecessor statute, the Tariff Schedules of the United States ("TSUS") Schedule 3, Part 1 E, Headnote 3(b), the term monofilament was defined as:

> 3. ....
> (b) the term *"monofilaments"* embraces single filaments (including single filaments of laminated construction or produced from two or more filaments fused or bonded together), whether solid or hollow, whether

(B) *Yarns*

(1) *General*

Textile yarns may be single, multiple (folded) or cabled. For the purposes of the Nomenclature:

(i) *Single yarns* means yarns composed either of:

    (a) staple fibres ...; or of

    (b) One filament (*monofilament*) of headings 54.02 to 54.05, or two or more filaments (*multifilament*) of heading 54.02 or 54.03, held together, with or without twist (*continuous yarns*).

Harmonized Commodity Description and Coding System, Section XI, General Explanatory Note I(B) (1986). Defendant argues "[t]his General Explanatory Note indicates that the term monofilament, as used in Section XI, means one (single) filament" that is "generally created by extrusion with a constant cross-section." (Def.'s Br. at 16.)

Further, defendant argues "[t]he Explanatory Notes' interpretation of the meaning of the term monofilament is additionally consistent with and supported by the common meaning of the term as defined in lexicographic authorities." (*Id.* at 17.) Defendant cites several authorities, including *The McGraw Hill Dictionary of Scientific and Technical Terms, The Oxford English Dictionary, A Dictionary of Textile Terms, Fairchild's Dictionary of Textiles, Webster's Third New International Dictionary, The Randomhouse Dictionary of the English Language,* and *The 1991 Annual Book of ASTM Standards,* and argues the "common thread" in all the lexicographical definitions is

> as designated in the HTSUS, that a monofilament means one long filament or fiber whose cross-section is very small in relation to its length, and is often made through extrusion.... Not a single definition specifies that a monofilament, in order to be a monofilament, must not be porous, or must have undergone a drawing process, have any amount of tensile

strength, be sold in terms of decitex, be used in a textile product, or be low cost. (*Id.* at 19.)

Defendant additionally refutes the five reasons provided by plaintiff to support its argument the merchandise at issue cannot be a monofilament, describing them as "inaccurate and unsupportable." (Mem. in Reply to Pl.'s Opp'n to Def.'s Cross–Mot. for Summ. J. ("Def.'s Reply") at 2.) First, defendant argues no lexicographical authority supports plaintiff's theory that a certain tensile strength is required for monofilaments. Additionally, defendant contends "the very face of the HTSUS shows that tensile strength is not a quality relevant to the identity of a product as a monofilament. Rather, the HTSUS demonstrates that tenacity can only simply affect the subheading of monofilaments under which a particular monofilament is classified." (Def.'s Br. at 20.) Defendant concludes:

> Baxter's contention that its merchandise has no strength because the imported monofilament can be broken by pulling on its ends, is, in and of itself, wrong. The fact that it can be torn does not show it has *no* strength; it means only that most humans are stronger than it. In comparison to many other materials, such as certain threads, however, the imported monofilament is quite strong [and] (sic) has some tenacity. In fact, Baxter admits that the imported monofilament has [a] (sic) tenacity of 9.35 cN/tex.

(Def.'s Reply at 5 n. 2 (citation omitted).)

Second, defendant maintains the HTSUS does not provide that every monofilament must, by definition, undergo drawing. Defendant argues, rather, the Explanatory Notes suggest the product is a filament when it emerges from the spinneret and "subsequent drawing is merely a way to 'improve' its performance characteristics." (Def.'s Br. at 21.) Defendant further points out an agent of plaintiff admitted a product could be a monofilament even though it had not undergone a drawing process. (*See id.* (citing *Deposition of Gregory P. Watson* in Def.'s Br., Ex. 1 at 69–70).) Defendant argues the Explanatory Notes for heading 8444, HTSUS, which cover machinery used to

manufacture monofilaments, describe drawing as a process whereby machines "stretch the filaments to three or four times their original length, a process which orients the molecules in the direction of the filaments thus considerably increasing its length." (*Id.* at 22.) Defendant concludes, "[c]onsequently, it is clear that a drawing process is not required in order for a material to be considered a monofilament." (*Id.*) Defendant further concludes in this case, "the imported monofilament remains a monofilament, but not a drawn monofilament." (Def.'s Reply at 9.)

Third, defendant argues "none of the lexicographic sources, nor language of the HTSUS, restrict monofilaments to articles which are solid, or not porous." (Def.'s Br. at 23.) Defendant cites *Matthews' Textile Fibers*, which states "[a]ll fibers differ greatly ... and no definite statements can be made regarding their relative porosity." (*Id.*) Defendant explains

> [t]he porosity of the imported monofilament does not "preclude" strength here, as claimed by Baxter.... The porosity simply has an effect on the degree of strength the imported monofilament possesses. Therefore, even if strength were necessary for a monofilament, the imported monofilament meets this element.
>
> It is plain that the presence of porosity does not prevent the imported monofilament from being classified as a synthetic monofilament.

(Def.'s Reply at 9–10 (emphasis omitted).)

In addressing plaintiff's fourth contention, defendant maintains plaintiff's arguments regarding decitex "also lack merit" because "[n]othing in the HTSUS limits the term decitex to textile applications." (Def.'s Br. at 24.) Defendant further argues "indeed, the Explanatory Notes to section 5404 of the HTSUS expressly note that monofilaments have several uses, many of which are *not* textile uses." (*Id.*) Defendant also points out plaintiff's expert admitted that use was irrelevant criteria in determining the meaning of the term monofilament. (*See id.*, (*citing Deposition of Gregory P. Watson*, in Def.'s Br., Ex. 1 at 88).)

Finally, defendant argues, in addressing plaintiff's fifth contention, "[n]ot a single authority of *any* nature supports [plaintiff's] theory that monofilaments are only of a certain—and undefined by Baxter—value." (*Id.* at 25.) Defendant concludes "Congress did not impose some arbitrary and amorphous cost limitation in the HTSUS, and Baxter should not be permitted to create it simply because it is beneficial to Baxter." (*Id.*)

After considering the evidence and argument of all parties, this Court finds Customs was correct in concluding the merchandise at issue is a monofilament. This Court notes defendant's conclusion that "every source, including admissions by Baxter, support the determination by Customs that [a] monofilament is defined, as shown in the HSTUS, as one long filament whose cross-section is very small in relation to its length, and [is] generally made through extrusion." (Def.'s Reply at 10.) The statements of plaintiff's agent, Gregory P. Watson, support this Court's conclusion. Although Mr. Watson testified in his deposition that the merchandise at issue was not a monofilament, *see* Pl.'s Opp'n to Def.'s Cross–Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. 2 at 68, his testimony leads to the opposite conclusion. Mr. Watson stated:

> Q. Okay. In order to be a monofilament, must a filament or a monofilament be created or—through a drawing process?
>
> A. By the terminology, I do not believe so.
>
> ....
>
> A. Okay. Practically it may be necessary, theoretically not okay. It doesn't have to be, I guess is my answer, if cost wasn't an issue and several other things.
>
> Q. I'm trying to find in your understanding of monofilament does it have to be created through a drawing process?
>
> A. I think the answer would be no.

(Def.'s Br., Ex. 1 at 69–70.) Mr. Watson additionally stated, in responding to defendant's question of whether tensile strength is necessary for a material to be classified as a monofilament:

> Q. [I]s it your understanding then, because of the fact it doesn't have tensile

strength, it would not be a filament or a monofilament?

A. I don't think that would necessarily discount it from being a monofilament.

(*Id.* at 74.) Mr. Watson further testified:

Q. But does the cost of a product itself by definition exclude a material that met all of the other requirements to being a monofilament from being a monofilament?

A. Not solely, no.

(*Id.* at 81–82.) Finally, Mr. Watson stated:

Q. Does use enter into the definition as to whether a product is a filament or a monofilament?

A. I think my answer would be no.

(*Id.* at 88.) This Court finds it is clear from the above that Customs correctly classified the merchandise as a synthetic monofilament. This Court agrees with defendant's argument that "Baxter made the dispositive factual admissions that under *its* understanding of monofilaments, they *factually* need not possess tensile strength, undergo a drawing process, lack porosity, not be sold in terms of decitex, be used in a medical application, or be high cost." (Def.'s Reply at 4.) Baxter's request that this Court, in considering its "employee's testimony on the meaning of the term 'monofilament,' ... not afford it great weight" does not alter this Court's decision. (Pl.'s Opp'n at 6.) Plaintiff chose to offer Mr. Watson as a witness for deposition in this case and plaintiff is obligated to abide by the results of Mr. Watson's testimony.

### C. *Whether the Merchandise at Issue is Properly Classified as an Unfinished Part*

Plaintiff argues even if the merchandise at issue were classified as a synthetic monofilament, the HTSUS does not mandate it be classified as a material under heading 5404, HTSUS. Plaintiff contends, rather, the merchandise at issue should be classified as a part or unfinished part of an "artificial respiration apparatus" in subheading 9019.20.0000, HTSUS, or an "electro-medical apparatus" in subheading 9018.90.70, HTSUS.

In HQ 954822, Customs responded to plaintiff's argument and addressed the issue of whether the merchandise at issue could be classified as a part, stating:

[t]he law governing unfinished articles under the TSUS[ ] is not the same as that under the HTSUS[ ]. General Headnote 10(h), TSUS, merely states that a tariff provision covers an article whether finished or not finished. The TSUS[ ] left up to the court and Customs to set the rules for deciding if an article had been sufficiently processed to be classified as a finished article. On the other hand, GRI 2(a), HTSUS[ ], though somewhat similar, contains the proviso that *for an incomplete or unfinished article, the unfinished or incomplete article must have the "essential character" of the complete or finished article.*

. . . .

It is the view of the Customs Service that for textile materials, . . . . to be classified under the HTSUS as unfinished articles pursuant to GRI 2(a), the identity of the finished articles to be made from those materials must be fixed with certainty. No matter how dedicated to a particular use a material is, it does not have the essential character of a finished article (and remains mere material) if the dimensions of the article to be made from that material are not fixed and certain.

In the instant circumstance, the fiber membranes are imported in 10 kilometer lengths and each oxygenator contains 2.3 kilometers of the imported membrane. Obviously, each length of membrane can be used to supply from one to four oxygenators, with some membrane left over. Accordingly, the dimensions, and therefore, the identity, of the article to be made from the imported goods is neither fixed nor certain and those goods may not be classified as unfinished articles.

HQ 954822 (December 22, 1994) (emphasis added).

Plaintiff argues Customs erred in concluding the merchandise at issue is not a part because "Customs erroneously concluded that the OXYPHAN® capillary membrane did not have the essential character of a part of an oxygenator because it is cut to length subsequent to importation." (Pl.'s Br. at 15.)

Plaintiff argues while "[t]here is no single test for determining what constitutes a 'part' for tariff classification purposes", the merchandise at issue "meets every accepted definition of the word 'part.'" (*Id.* at 12)

In support of its position, plaintiff also cites Explanatory Note VIII to GRI 3(b), which states "[t]he factor which determines essential character will vary as between different kinds of goods" and further explains the essential character of an article may be determined with respect to the "nature of the material or component, its bulk, quantity, weight or value, or by the role of a constituent material in relation to the use of the goods." (*Id.* at 16–17 (quoting Harmonized Commodity Description and Coding System, Explanatory Note VIII to GRI 3(b) (1986)).) Plaintiff concludes "[i]n this case, ... the imported OXYPHAN® capillary membrane has the essential character of a part of Baxter's UNIVOX® oxygenators." (*Id.* at 17.) In support of this contention, plaintiff maintains "the role of the capillary membrane is to oxygenate blood, and the capillary membrane has all the physical characteristics necessary to fulfill this role at the time of importation." (Pl.'s Opp'n at 18–19.)

In addressing plaintiff's argument the merchandise at issue should be classified as a part and not a material, defendant argues "both the HTSUS and judicial precedent demonstrate that monofilaments-even those cut to size or cut to short lengths-cannot comprise a part of an article; the monofilament by definition remains a material." (Def.'s Br. at 26.) Defendant argues only a limited number of specific monofilaments, which have been cut into lengths for individual articles and further manufactured in some additional way so that they are identifiable as

new articles, fall outside the statutory scheme and can be considered as more than material. Defendant cites the Explanatory Notes to heading 5404 which provide:

All these products are generally in long lengths, but remain classified here even if cut into short lengths and whether or not put up for retail sale. They are used according to their different characteristics in the manufacture of brushes, sports rackets, fishing lines, surgical sutures, upholstery fabrics, belts, millinery braids, etc.

(*Id.* (quoting Harmonized Commodity Description and Coding System, Explanatory Notes to Heading 54.04 (1986)).) Defendant also points out the Explanatory Notes state heading 5404 does not include:

(a) Sterile synthetic monofilament (*heading 30.06*).

(b) Synthetic monofilament of which any cross-sectional dimension exceeds 1 mm, or strip and flattened tubes (including strip and flattened tubes folded along the length), whether or not compressed or twisted (for example, artificial straw), *provided* that the apparent width (i.e., in the folded, flattened, compressed or twisted state) exceeds 5 mm (*Chapter 39*).

(c) Synthetic monofilament measuring less than 67 decitrex of *heading 54.02*.

(d) Strip and the like of *Chapter 56*.

(e) Synthetic monofilament, with hooks attached or otherwise made up into fishing lines (*heading 95.07*).

(f) Prepared knots and tufts for brushmaking (*heading 96.03*).[6]

(*Id.* at 26–27 (quoting Harmonized Commodity Description and Coding System, Explana-

---

**6.** Plaintiff disagrees with defendant's explanation of the Explanatory Notes' list of monofilaments excluded from heading 5404 and argues the defendant's rule "that an article must be processed to be removed from classification in HTSUS heading 5404" is "a rule to which even Customs does not adhere." (Pl.'s Opp'n at 16.) Plaintiff argues the more logical explanation of why these articles are listed in the Explanatory Notes "is that they are examples of products that are specifically described elsewhere in the tariff schedule, or are articles that do not meet the very

terms of the heading." (*Id.* at 17.) In response to this argument, defendant maintains

Baxter's hypothesis ... first ignores the Explanatory Note dictate[s] (sic) that monofilaments remain classified in heading 5404 "even if cut into short lengths and whether or not put up for retail sale." Under Baxter's reasoning, this Explanatory Note language is extraneous as all monofilaments would be classified under this heading unless specifically described elsewhere, regardless if the monofilament was cut into short lengths or not.
(Def.'s Opp'n at 11–12.)

tory Notes to Heading 54.04 (1986)).) Defendant concludes:

[t]he Explanatory Notes specify that only a limited number of specific monofilaments which have been cut into lengths for individual articles *and* were further manufactured in some additional way so that they are identifiable as the new article, fall outside of this statutory scheme, and can be considered more than material.

(Def.'s Br. at 27.) Contrary to the distinguishing characteristics set forth in the Explanatory Notes, defendant argues the merchandise at issue in this case is not additionally processed in any manner until after it is imported, and, as a result, "the imported monofilament remains a material—synthetic monofilament—rather than a part of an unfinished part of another product, until after importation when it is prepared for use, by combining with other monofilaments, wrapping, cutting, recutting, and assembling into its final configuration for use in oxygenators." (*Id.* at 28–29.)

Defendant additionally argues "in light of the fact that the imported monofilament remains a material classifiable as synthetic monofilament pursuant to the language of the heading 5404, HTSUS, and the imported monofilament cannot, as a matter of law, be considered a part or an unfinished part, GRI 2(a) does not apply in this action." (*Id.* at 30–31.) Defendant argues if the merchandise at issue were considered to have the essential character of the finished oxygenator, "[a]lmost any material would have the essential character of the finished good into which it is to be made or incorporated, because a manufacturer's specifications imitates the finished properties (special design, composition, or construction). This could not have been the intention of the drafters of GRI 2(a)." (*Id.* at 32.) Defendant further argues even if GRI 2(a) did apply, "the imported monofilament here does not have the essential character of a part of an oxygenator; it has the essential character of monofilament." (*Id.* at 31) Defendant explains

Here, the essential character of the imported monofilament is a filament, and not an oxygenator. Most obviously, the imported monofilament meets every quali-

ty of a monofilament. In order to become an oxygenator, on the other hand, the imported monofilament must undergo significant transformation from a monofilament.... The essential character of oxygenator cartridges appears to be the spiraled monofilaments wrapped into its final configuration around the bellows, sealed in the cartridge and cut into thousands of exposed pieces, ready for use as oxygenators, not the imported monofilament.

(*Id.*) Defendant additionally argues the merchandise at issue does not have the essential character of a part of an oxygenator because "one, if not more, of its crucial dimensions are not set upon importation" (*id.* at 32 (citations omitted)), and "the imported monofilament must undergo significant transformation from a monofilament into an oxygentor." (Def.'s Reply at 12–13.) Defendant further responds to plaintiff's argument the number of oxygenators to be created from each spool is known prior to importation by contending

Baxter failed to, and indeed, cannot, demonstrate that the lengths of the imported monofilament as imported *can* oxygenate blood alone, or contain all of the necessary physical characteristics to oxygenate blood. It is only after the imported monofilament is unwound from the spool, twisted with additional monofilaments, rewound around bellows, cut, encased, sealed with polyurethane, and recut, that the article obtains the "properties" to oxygenate blood.

(*Id.* at 13.) Defendant concludes "[b]ecause the imported monofilament does not have the essential character of an oxygenator, and the dimensions, and therefore, the identity, of the imported monofilament is neither fixed nor certain at importation, Baxter's argument that the imported monofilament may be classified as unfinished parts, must fail." (Def.'s Br. at 35.)

This Court notes the question of whether merchandise is classified as a material or as an unfinished part is determined on a case-by-case basis. *See The Harding Co. v. United States*, 23 C.C.P.A. 250 (1936) (brake lining imported in rolls measuring 100 feet in length and used to make different sized brake shoes was not classified properly

as "parts of automobiles" but rather as "asbestos yarn" because merchandise was not cut to length or marked to indicate where it was to be cut); *Benteler Indus., Inc. v. United States*, 17 CIT 1349, 840 F.Supp. 912 (1993) (articles used exclusively as side door impact beams were classified as "parts" rather than "material" even though they were cut to length subsequent to importation because the imported pipes required no additional parts or assembly)[7]; *J.E. Bernard & Co., Inc. v. United States*, 50 Cust. Ct. 41, 50, C.D. 2386 (1963) (tempered and polished bands or strips of steel with saw teeth imported in coils of 100 and 500 feet were properly classified under the provision for "steel bandsaws" rather than "manufactures of steel, not specifically provided for," because "[a]ll that remains to be done in this country to prepare the merchandise for its ultimate use is to cut and weld the bandsaw to the length desired for the particular machine with which it is to be used" and that at the time of importation the character and identity of the article as a steel bandsaw was fixed with certainty).

■ Unlike the merchandise in *J.E. Bernard & Co.*, and *Benteler Industries*, the Court finds from the evidence before it in this case, the identity of the merchandise at issue is not known with the same certainty. While plaintiff argues that "[o]ther than length, no dimension of the imported merchandise was modified between its condition as imported and when the merchandise is actually used as a part of plaintiff's blood oxygenator", (Pl.'s Stmt. of Mater. Facts at 5), defendant maintains "absolutely nothing is 'predetermined' in the winding of the imported monofilament" (Def.'s Reply at 15), because

> after substantial processing, the imported merchandise was cut to finished lengths of approximately 9½ inches for use in one or more of plaintiff's oxygenators.... [A]fter importation, the dimensions of the imported monofilament material change, as it is transformed into a new spiraled materi-

al. The process of spiral wrapping the imported monofilament with the polyester monofilament created a new material with different dimensions and characteristics. It has new decitex and cross-sectional dimensions, and it takes on a new shape. When this material is cut after the bellows are filled, the length dimensions change. When the spiraled material is ultimately cut into thousands of short lengths for use in an oxygenator, the dimensions are changed again.

(Def.'s Resp. to Pl.'s Stmt. of Mater. Facts at 6.) This Court notes defendant's explanation

> [t]he product is simply a spool of monofilament material, not emerging oxygenator filters.... Where to cut cannot be preset or predetermined prior to importation because when the bellows will be filled is dependent on changing variables, such as variances in the size of the bellows and the cross-sectional dimensions of the monofilaments used.

(Def.'s Br. at 34–35). This Court further notes defendant's explanation

> Baxter's machine was, at best, programmed to stop winding when the outside diameter of the last turn on a specific bellow was a specified length. Because each bellows was different, and the width of each length of imported monofilament deviated, the number of turns which were required to fill a specific bellows varied for each and every bellows. Therefore, the length of imported monofilament required to fill each bellows changed with each bellows wrapped, and the number of turns required to fill each bellows, was *not*, and *cannot*, by definition, be predetermined. Baxter's contentions to the opposition (sic) are simply disingenuous.

(Def.'s Reply at 15.)

This Court finds the imported merchandise cannot be classified as unfinished parts. The Court finds unlike the imported merchandise in *Benteler*, which, as imported, consisted of the final article, the imported monofilament

---

7. The Court notes defendant's observation that *Benteler* was decided under the TSUS, which contained a different standard from HTSUS heading 5404, which provides even if a material is cut to shorter lengths, it remains a material unless advanced to a stage where it is identifiable as a finished article.

here is not an oxygenator, but is a single material which is used, along with several other materials, to create oxygenators. This Court also finds Customs' explanation in HQ 954822, in interpreting GRI 2(a), that

[i]n the instant circumstance, the fiber membranes are imported in 10 kilometer lengths and each oxygenator contains 2.3 kilometers of the imported membrane. Obviously, each length of membrane can be used to supply from one to four oxygenators, with some membrane left over. Accordingly, the dimensions, and therefore, the identity, of the article to be made from the imported goods is neither fixed nor certain and those goods may not be classified as unfinished articles

(HQ 954822 (December 22, 1994)) is correct.

D. *Whether the Merchandise is Properly Classified as Part of an Artificial Respiration Apparatus in HTSUS Subheading 9019.20.0000 or as Electro–Medical Apparatus in HTSUS subheading 9018.90.7080*

▮ After arguing the merchandise at issue should be classified as a part, instead of as a material within subheading 5404, HTSUS, plaintiff presents the Court with two alternative subheadings under which it argues the merchandise at issue should be classified. Although this Court has already determined the merchandise at issue cannot be classified as a "part", it will address briefly plaintiff's argument the merchandise at issue should be classified as part of an "artificial respiration apparatus" or as part of an "electro-medical apparatus".

Plaintiff argues the merchandise at issue should be classified as part of an "artificial respiration apparatus" in subheading 9019.20.0000, HTSUS. Because the HTSUS does not define this term, plaintiff looks to its commercial or common meaning and argues "the UNIVOX® oxygenators are 'artificial respiration apparatus'" under subheading 9019.20.0000, HTSUS. (Pl.'s Br. at 22.) Plaintiff maintains the definition of artificial respiration as a "'method to restore respiration' in cases of suspended breathing'" as well as "'the maintenance of respiratory movements by artificial means'" demon-

strates artificial respiration "is not limited to the maintenance of respiratory movements, but also includes restoration of respiration." (Pl.'s Opp'n at 28 (quoting *Taber's Cyclopedic Medical Dictionary* 138, 1476–77 (15th ed.1985)).) Plaintiff concludes artificial respiration also includes man-made methods of placing air "'in intimate contact with the circulating medium (as blood) of a multicellular organism *whether by* breathing, diffusion through gills or blood surface, or other means'" (*Id.* (quoting *Webster's Third New International Dictionary* 1934 (1971) (emphasis added by plaintiff))) and "[t]he oxygenator made by Baxter meets this definition because it places oxygen in intimate contact with a patient's blood through the process of diffusion." (*Id.* at 28–29.)

Defendant argues "[e]ven assuming for the sake of argument that Baxter is correct that the imported monofilament could somehow be considered a 'part' of an oxygenator, rather than as 'material'", (Def.'s Br. at 36),

[i]t is clear, most obviously, that there is no authority whatsoever that suggests that artificial respiration is equivalent to "man-made methods" of respiration. Further, based upon either definition in *Taber's,* the oxygenator does not perform artificial respiration. The oxygenator does not maintain respiratory *"movements;"* it does not *"restore"* respiration. It is simply a machine designed to oxygenate blood until respiratory movements can be restored by another means.

Secondly, the exemplars in the Explanatory Notes demonstrate that heading 9019.20 covers only apparatuses which actually perform the act of physical respiration, forcing air in and out of the lung. Not a single example suggests that 9019.20 covers articles outside of the definition of artificial respiration apparatus, such as those which simply oxygenate blood when blood alone is passed through them.

(Def.'s Reply at 18.) Defendant concludes the Explanatory Notes demonstrate that while heading 9019.20, HTSUS, covers only apparatus which actually perform the act of physical respiration or respiratory or breathing functions, "Baxter's oxygenators do not perform these or any similar breathing oper-

ations" but instead "simply oxygenate blood circulated through the oxygenator" and are, therefore, "not *ejusdum generis* with the articles listed in heading 9019.20." (Def.'s Br. at 38.)

This Court concludes even if the merchandise at issue were classified as a part, it would not be classified as part of an artificial respiration apparatus. Common lexigraphic sources support defendant's argument. *See, e.g., Dorland's Illustrated Medical Dictionary* 1448 (28th ed.1994) (defining artificial respiration as "any method of forcing air into and out of the lungs of a person who has stopped breathing"); *Taber's Cyclopedic Medical Dictionary* 126–27, 1239 (14th ed.1981) (defining artificial respiration as "[a]rtificial methods to restore respiration in cases of suspended breathing" and "maintenance of respiratory movements by artificial means"). The Court finds the merchandise at issue simply does not perform the act of artificial respiration as it is defined by common and commercial meaning.

This Court also notes plaintiff's alternative argument "[b]ecause [the oxygenators are] used in medical science for blood oxygenation and an oxygenation system requires electricity to operate, Baxter's oxygenator is an electro-medical apparatus" properly classified under subheading 9018, HTSUS. (Pl.'s Br. at 23.) This Court also notes defendant's counter argument if the imported monofilament is classifiable as part of an oxygenator, the proper classification is as part of electrosurgical appliance and apparatus, under subheading 9018.90.60, HTSUS, because Baxter's oxygenators function as the apparatus named in that subheading and are *ejusdum generis* with items classified in that subheading.

Because this Court has determined the merchandise at issue is a material rather than a part, and was properly classified by Customs under subheading 5014, HTSUS, the Court will not address further the parties' proposed alternative classifications. This Court also finds it need not address plaintiff's arguments regarding Additional Rule of Interpretation 1(c) and its mandate that a part must be classified in a parts provision if the parts provision most specifically describes the part, or plaintiff's claim the merchandise at issue should also be classified as a part because each is a use provision, and a use provision prevails over an eo nomine provision.[8] Finally, the Court finds plaintiff's contention "Note 2 to Chapter 90 governs classification of parts of articles of Chapter 90, and requires the capillary membrane to be classified in Chapter 90" (Pl.'s Opp'n at 26)[9], is inapplicable because, as defendant points out, "Note 2 only dictates the classification of articles which are *parts* and are goods falling in certain headings in Chapter 90. If the imported product is *not* a part-as here-it cannot be a part which is a good falling within Chapter 90. Note 2 therefore does not apply on its face." (Def.'s Reply at 16–17.)

### CONCLUSION

For all the reasons discussed above, this Court denies plaintiff's Motion for Summary Judgment and grants defendant's Cross–Motion for Summary Judgment, finding Customs correctly classified the merchandise at issue as a material under subheading 5404.10.8080, HTSUS, instead of as a part under either of plaintiff's two alternative proposed subheadings. This Court denies plaintiff's Motion for Oral Argument because it finds the issues presented have been made clear by the briefs submitted.

### JUDGMENT ORDER

This case having been submitted for decision and this Court, after due deliberation, having rendered a decision herein; now in conformity with said decision, it is hereby

---

8. A use provision is one where classification is defined by the use of an article whereas an *eo nomine* provision is one which describes merchandise by a specific name, usually one well-known in the trade, which includes all forms of the article as if each were provided for by name in the tariff provisions.

9. Note 2 to Chapter 90, HTSUS, provides that parts which are goods falling within certain headings in Chapter 90, including those headings at issue, are, if suitable for use solely or principally with a particular kind of machine, to be classified with the machines of that kind.

**ORDERED** that plaintiff's Motion for Summary Judgment is denied; and it is further

**ORDERED** that defendant's Cross–Motion for Summary Judgment is granted; and it is further

**ORDERED** that plaintiff's Motion for Oral Argument is denied.